**In re SKY VALLEY, INC., Debtor.**

**Bankruptcy No. G88–20041.**

United States Bankruptcy Court,
N.D. Georgia,
Gainesville Division.

Sept. 12, 1988.

John Michael Levengood, Atlanta, Ga., for plaintiff.

Alfred Lurey, Atlanta, Ga., for Bank South.

Susan W. Kramer, Atlanta, Ga., for Anchor Sav. Bank F.S.B.

## ORDER

MARGARET H. MURPHY,
Bankruptcy Judge.

This matter is before the Court on Debtor's motion filed July 11, 1988 for authorization to obtain credit in the amount of approximately $400,000 pursuant to 11 U.S.C. § 364(d). Notice of Debtor's motion was given pursuant to Bankruptcy Rule 2002(i) and to all creditors with an interest in the property on July 11, 1988. A preliminary hearing was held July 27 and continued to July 28, 1988. While the entire loan requested was addressed at the preliminary hearing held July 27 and 28, the subject of immediate relief sought was therein limited to $65,000 of the aggregate $400,000 in credit sought. By order entered July 29, 1988, the Court authorized Debtor to borrow $65,000 for immediate needs from Bank South, NA (hereinafter "Bank South") and granted Bank South priority for same under 11 U.S.C. § 364(c)(1).

Debtor now seeks authority to borrow an additional $335,000 and up to $25,000 to reimburse Bank South for closing costs. The final hearing, following the preliminary hearing, commenced August 4, 1988, was continued on August 5, 1988, and was completed August 9, 1988. Specifically, Debtor seeks:

(1) In connection with Debtor's plans to sell its remaining Valley View condominiums at public auction, to allocate $90,000 for advertising expenses and to construct a septic system drain field to serve the condominiums.[1] Debtor

---

1. Anchor Bank has indicated it will not consent to Debtor's proposed placement of the drain field on property which secures Anchor Bank's claim. The issue which may be created thereby, however, has not yet ripened into a controversy.

plans to repay the $90,000 from the proceeds generated by the sale of the condominiums.

(2) To allocate $144,900 to maintenance and improvement of Debtor's 18-hole golf course: $53,000 to replace old golf course equipment to maintain the greens and fairways; $8,500 for bent grass seed for rebuilding tees, $5,500 for sand for the traps, $27,900 for repairs to the asphalt cart paths, $35,000 for a irrigation pump to replace the jury-rigged system now in use, and $15,000 for purchase of fertilizer and fungicide.

(3) To allocate $25,000 for the purchase of Sky Valley marketing brochures.

(4) To reserve approximately $27,000 for the payment of four quarterly interest payments under the loan.

(5) To reserve the remainder of the borrowed funds, approximately $50,000 for general administrative expenses.

The hearings commenced to hear objections to Debtor's motion filed by the United States Trustee and three lien claimants— Anchor Savings Bank FSB (hereinafter An-chor Bank), the City of Sky Valley, and Larry T. McClure, Jr. All the objectors except Anchor Bank have since withdrawn their objections.

## FINDINGS OF FACT

This case commenced January 28, 1988. Debtor owns Sky Valley, a resort in Rabun County, Georgia which includes a ski slope and an 18-hole golf course. Anchor Bank holds a first priority security interest in Debtor's resort property in the amount of approximately $2,852,000 as of July 31, 1988. Bank South holds a second priority security interest in the approximate amount of $6,524,000. Larry P. McClure holds a security interest in the amount of $1,011,730. The City of Sky Valley, Rabun County, and the State of Georgia hold tax liens which total $108,149 and a materialman's lien claim exists in the amount of $20,985. The total amount of liens on Debtor's property is approximately $10,-497,000. Figure 1 sets forth in detail the relative priorities of claims asserted against the property of Debtor.

## FIGURE 1

### RELATIVE PRIORITIES OF LIEN CLAIMS ASSERTED AGAINST PROPERTY OF DEBTOR

Rank in Priority/Claim Amount

| | First | Second | Third | Fourth |
|---|---|---|---|---|
| Tracts A, B, C & D include the Valley condominiums—$2 million approximate value | City of Sky Valley—approx. $12,000 | Tax Commissioner of Rabun County approx. $16,000 | Bank South $6,650,000 | n/a |
| Tract E (includes Tracts 1–4, 6–9, 11, 13–23, 25)—approx. value $7.5 million | City of Sky Valley approx. $39,000 | Tax Commissioner of Rabun County approx. $44,000 | Anchor Bank[1] $2,852,023 | Bank South[2] $4,000,000 |
| N.C. Property (Tracts 26 & 27)— $896,000 approx. value | Rabun County Bank/McClure $400,000 | Anchor Bank[1] $2,852,023 | Larry P. McClure $611,730 | Bank South $6,524,383 |

|  | First | Second | Third | Fourth |
|---|---|---|---|---|
| Timeshare units—$100,000 approx. value. | Anchor Bank [1] | N/A | N/A | N/A |

1. The aggregate claim of Anchor Bank's prepetition debt is $2,852,023.

2. Bank South also holds a 6th priority claim in the amount of $2,524,383. The aggregate claim of Bank South's prepetition debt exceeds $4 million and may exceed $6.65 million. Larry P. McClure holds a 5th priority claim in the amount of $611,730. The aggregate claim of McClure's prepetition debt is $1,011,730. The Georgia Department of Labor holds a 7th priority claim in the amount of $3,148.81. The Omega Hospitality Group holds an 8th priority materialman's claim in the amount of $20,985.

At the hearing, Debtor's principal, Mr. George Mason, testified that in his (inexpert) opinion the value of the Sky Valley property is $12 to $14 million, summarized as follows:

| | |
|---|---|
| Raw land | $ 5.4 million |
| Single family lots | $ 3.0 million |
| Multifamily devel. | $ 1.4 million |
| Golf Course | $ 3.5 million |
| Ski facility | $ 0.8 million |
| Timeshare units | $ 0.5 million |
| | $14.6 million |

James Pritchett, a professional appraiser testifying for Anchor Bank at the final hearing, also assessed the value of the Sky Valley property. Mr. Pritchett's original appraisal valued the property which secures the loan by Anchor Bank at approximately $7.5 million. During examination and cross-examination at the hearing, Pritchett adjusted his appraisal based on the evidence presented to include the Valley View condominiums, which results in a valuation of approximately $9.5 million.

Debtor presented additional evidence of two adjustments to the valuation, based on the improvements which Debtor seeks to make to the golf course and on the condominiums. Pritchett's evaluation of the golf course was based on 1986 statistics. Following Pritchett's testimony, Debtor argued that Pritchett's valuation of the golf course was based on an incorrect cost per round of golf. Figure 2 shows the comparative analyses of Pritchett and Debtor concerning the value of the golf course:

FIGURE 2

COMPARATIVE VALUATION OF
SKY VALLEY GOLF COURSE [1]

| | Anchor Bank | Debtor | |
|---|---|---|---|
| Golfer Rounds | 32,000 | 30,000 | 30,000 |
| Average Price/round [2] | $18.50 | $23.50 | $28.50 |
| Total Gross Income | $592,000 | $705,000 | $855,000 |
| Total Operating Expense | 340,400 | 340,400 | 340,400 |
| Net Operating Income | 251,600 | 364,600 | 514,600 |
| Capitalization Rate | 14% | 14% | 14% |
| Gross Valuation | $1,797,143 | $2,604,286 | $3,675,714 |
| Net Valuation ($\times$ 0.8) [3] | $1,437,714 | $2,083,429 | $2,940,571 |

1. Sky Valley Golf Course is currently an 18–hole golf course. The original resort plan included the addition of 9 holes. The Court has not considered either party's projections regarding a 27–hole golf course because no immediate plans exist to add the 9–hole golf course.

2. Pritchett based his valuation on the cost per round of golf in 1986. Debtor testified that the 1988 cost per round is $5 more than in 1986, or $23.50. Debtor further testified to its intent to increase the cost per round by another $5 if the proposed superpriority financing is approved. Debtor's valuations are based on those increases in the cost per round.

3. Pritchett's analysis of value discounts the Gross Valuation shown by 20% because the golf

course, as a part of the entire resort, should be valued on a wholesale basis rather than independently, as if it were sold apart from the resort. Accordingly, the court discounts Debtor's suggested values.

---

Using the correct figures for the current average cost per round of golf indicates an increase in the present value of the golf course of $646,000.

The second adjustment takes into account an immediate sale of the condominiums. Debtor argues that by selling each of the condominiums separately at a retail auction, as Debtor proposes to do immediately, their present value is greater. This Court agrees and finds the value of the condominiums, if sold this Fall as proposed, is increased by no less than $400,000. Finally, $100,000 in timeshare units which serve as collateral for Anchor Bank's loan were omitted in Mr. Pritchett's appraisal. Therefore, the increased valuation of the Sky Valley property which serves as security for Anchor Bank is approximately $8.6 million. Figure 3 sets forth in detail the comparative valuations of the Sky Valley property.

---

FIGURE 3

COMPARATIVE VALUATIONS OF
PROPERTY OF DEBTOR [1]

| Property | Anchor Bank's Valuation | Debtor's Valuation | Court's Valuation |
|---|---|---|---|
| 780.3 acres developed and developed land [2] | $4,463,000 | $4,463,000 | $4,463,000 |
| Golf Course | 1,438,000 | 2,900,000 | 2,083,000 |
| Ski Facility, Lodge Retail Store & Pro Shop | 1,000,000 | 1,000,000 | 1,000,000 |
| North Carolina Property | 896,000 | 896,000 | 896,000 |
| Timeshare units | 100,000 | 100,000 | 100,000 |
| Subtotals: | $7,897,000 | $9,359,000 | $8,542,000 |
| Valley View condominiums [3] | $1,600,000 | $2,400,000 | $2,000,000 |
| Totals: | $9,497,000 | $11,759,000 | $10,542,000 |

1. Anchor Bank's valuation is based on the appraisal of James Pritchett. Debtor's valuation is based on the increase of values presented by Pritchett which were argued by Debtor at the hearings.
2. Acreage includes 55 developed lots (17.9 acres); 67.2 undeveloped acres designated or multifamily dwellings; 10 undeveloped acres designated for commercial development; and 685.5 undeveloped acres designated for single family dwellings.
3. The Valley View Condominiums are not collateral for any part of the debt owed to Anchor Bank. The condominiums are, however, proposed as part of the collateral for the superpriority loan.

---

The above figures show the total value of the property at least equals and probably exceeds the outstanding secured debt thereon. As a result, the loans sought by Debtor present a greater risk to the most junior secured parties' position as fully secured—in an amount up to or slightly exceeding the amount of the new loans. Bank South, the institution which has agreed to extend the proposed financing to Debtor, would be subject to that loss of security as to the condominium property and the North Carolina property. Larry P. McClure, the Georgia Department of Labor and the Omega Hospitality Group would be subject to the loss of security as to Tract

E. None of these parties objects to Debtor's motion.

Debtor's principal approached the following lenders to obtain financing for the projects set forth in the instant motion for authorization to obtain credit: C.B. Fair at Bank of Clayton in Rabun County, Georgia (hereinafter Bank of Clayton); Joe Bell at Carolina Mountain Bank in Highlands, N.C. (hereinafter Carolina Mountain Bank); Anchor Bank; and Bank South. Debtor's principal stated he approached only those lenders familiar with Debtor and its problems. Clayton Bank and Carolina Mountain Bank would have agreed to provide financing to Debtor only if they obtained superpriority for their prepetition claims in addition to superpriority for the proposed postpetition financing. Anchor Bank refused to provide financing to Debtor on any terms. Only Bank South is willing to extend credit to Debtor and only under the conditions proposed by Debtor. In July, the Court authorized Debtor to obtain an emergency loan in the amount of $65,000 pursuant to § 364(c)(1). Debtor now seeks authorization to borrow the additional amount of the aggregate loan pursuant to the provisions of § 364(d).

## CONCLUSIONS OF LAW

■ Anchor Bank contends Debtor's motion should be denied because Debtor has failed to show the requested loan is essential to the preservation of the estate. Anchor Bank's reliance for this argument, however, on the case of *Weems v. Scandia Builders, Inc.*, 446 F.Supp. 115 (N.D.Ga. 1978) (hereinafter *"Scandia"*), is misplaced. *Scandia* was decided under Chapter XI of the Bankruptcy Act of 1898 (hereinafter "the Bankruptcy Act"). Chapter XI of the Bankruptcy Act prohibited a Debtor from modifying a secured creditor's rights, as Chapter XI was designed to modify the rights of only unsecured creditors, unlike Chapters X and XII, which were designed to allow the modification of treatment of secured debts. The Bankruptcy Code of 1978 merged Chapters X, XI and XII into one Chapter 11 proceeding which allows the modification of secured debt. Thus, the rationale in *Scandia* is inapposite in the instant case.

The procedure by which a debtor in possession may obtain credit during the pendency of the Chapter 11 proceeding is set forth in 11 U.S.C. § 364.[2] Section 364 provides:

Obtaining credit.

(a) If the Trustee is authorized to operate the business of the debtor under § 721, 1108, 1304, 1203, or 1204 of this title, unless the Court orders otherwise, the Trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under § 503(b)(1) of this title as an administrative expense.

(b) The Court, after notice and a hearing, may authorize the Trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

(c) If the Trustee is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in § 503(b) or 507(b) of this Title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

---

**2.** Section 364 is, by its express terms, applicable to the Trustee. Pursuant to 11 U.S.C. § 1107, however, the Debtor-in-Possession has "all the rights, ... and shall perform all the functions and duties ... of a Trustee serving in a case under this Chapter."

(A) the Trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior lien or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

Bank South[3] lent Debtor the previously authorized $65,000 and has agreed to lend Debtor the additional amount of the aggregate loan under the terms proposed, e.g. that Bank South will receive a superpriority lien limited to the total amount of the new loan.[4] Pursuant to § 364(d), Debtor must show (1) the debtor in possession is unable to obtain credit otherwise; and (2) the senior lienholder, which will be supplanted, or "primed," by the superpriority lienholder, is adequately protected.

■ Anchor Bank argues that Debtor has failed to show that it "is unable to obtain such credit otherwise" because Debtor approached only 3 other lenders. Anchor Bank argues that Debtor's search for lenders must be much more exhaustive in order to meet the standard required in § 364(d)(1)(A). Anchor Bank relies on the case of *In re Beker Industries, Corp.*, 58 B.R. 725 (Bankr.S.D.N.Y.1986), in which the debtor unsuccessfully approached 35–40 lenders prepetition and approximately 20 lenders post-petition.

In the instant case, however, it would be unrealistic and unnecessary to require Debtor to conduct such an exhaustive search for financing. Debtor's property is a resort complex valued at approximately $10.5 to $12 million and is located in the North Georgia mountains. By the nature of the instant proceeding, it is clear that Debtor suffers some financial stress and has little or no unencumbered property. In such a circumstance, a potentially interest-

ed lender is likely either: (a) to hold a pre-petition security interest in Debtor's property and thus, is already at risk; or (b) to do business in the community surrounding the resort and, thus, is interested in preserving community land values by preserving Debtor's resort. *See, Bray v. Shenandoah Federal Savings & Loan Association (In re Snowshoe)*, 789 F.2d 1085, 1088 (4th Cir.1986) (hereinafter *"Snowshoe"*). In the instant case, Debtor approached both pools of potential lenders unsuccessfully, excepting the proposed offer from Bank South now before the court. Therefore, this court finds Debtor is unable to obtain credit otherwise.

■ The other element of § 364(d) is adequate protection of the interest of the primed lienholder. The Debtor bears the burden of proof on the issue of adequate protection. The provisions concerning adequate protection contained in § 361 apply to § 364.

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of

---

**3.** Bank South holds a junior security interest in Debtor's property in the approximate amount of $6,524,000. See Figure 1.

**4.** Neither Debtor nor Bank South has proposed that any portion of Debtor's prepetition debt to

Bank South be accorded superpriority. Thus, the issue of forward cross collateralization is not before the court. *See In re Vanguard Diversified, Inc.*, 31 B.R. 364 (Bankr.E.D.N.Y.1983).

this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

The flexible provision of § 361(3) allows for many and varied means of adequate protection. Various means of protections have been found adequate. In the case of *In re First South Savings Association,* 820 F.2d 700 (5th Cir.1987), the Court postulated that an increase in the value of the collateral generated by the improvements resulting from the superpriority financing could constitute adequate protection.[5] *See also, In re Southerton Corp.,* 46 B.R. 391 (D.C.M.D.Pa.1982). In the *Snowshoe* case, 789 F.2d 1085, the court held an equity cushion of approximately $6 million on a claim of $13 million was adequate protection when coupled with the Trustee's projection of repayment of the superpriority loan within five years.

In the case of *In re Dunes Casino Hotel,* 69 B.R. 784 (Bankr.D.N.J.1986), the court found an equity cushion, based on a debt of approximately $17.5 million and collateral valued at a minimum of $26.2 million, was alone adequate protection, especially in view of the relatively small amount, approximately $700,000, of the superpriority loan the debtor sought. *But see, In re Alyucan Interstate Corp.,* 12 B.R. 803 (Bankr.D.Utah 1981), wherein the court found an equity cushion may be part of the bargained-for consideration and thus, could not constitute adequate protection.[6] The case of *In re Besler,* 19 B.R. 879 (Bankr.D. S.D.1982), a replacement lien was held to be adequate protection. Additionally, individual methods of providing protection may be combined to produce sufficiently adequate protection. *See In re Shockley Forest Industries, Inc.,* 5 B.R. 160 (Bankr.N.D. Ga.1980) (adequate protection consisted of an equity cushion, an additional lien on unencumbered property, and cash payments.

Anchor Bank argues in its brief that because the total of *all* the outstanding liens on Debtor's property is greater than or equal to the value of the property, no equity cushion exists. Anchor Bank lacks standing, however, to argue on behalf of the other lienholders who, after due notice and an opportunity to be heard, either never objected or filed objection to Debtor's motion and withdrew them during the hearings.

Anchor Bank has a first priority security interest in the approximate amount of $2,852,000.00. Debtor's property in which Anchor Bank claims an interest is valued at $8.5 million, and may be worth more if the Debtor successfully reorganizes. Thus, the subordinate lenders are exposed, by definition, to a much greater risk than the first priority lender. Without doubt, the clearest danger when proposing to prime existing secured lenders is that the new loan may result in rendering existing lenders' interests undersecured. No danger exists that Anchor Bank's loan will become undersecured to any degree.

Further, the combination of the liens of substance held by subordinate lenders together with the relatively small size of the loan Debtor seeks, when compared to the aggregate value of the property protecting Anchor Bank's loan, provides adequate protection for Anchor Bank. Anchor Bank is protected by an equity cushion of more than $5.7 million. In some circumstances, an equity cushion alone may provide adequate protection. *In re Dunes Casino Hotel,* 69 B.R. 784. This is one.

Additionally, Debtor proposes to repay the new loans promptly. The expenditures to facilitate the sale of the condominiums will be repaid from the sales proceeds. The expenditures for maintenance and improvements to the golf course will be recouped from increased greens fees, from an annual recreational fee assessment to be

---

5. The *First South* Court concluded, however, that the Debtor's projections did not support a finding of such an increase in value.

6. Such a premise is not relevant in the instant case because Anchor Bank allowed Debtor to grant junior liens in amounts almost four times that of Anchor Bank's lien. Thus, it is apparent an equity cushion was not bargained for by Anchor Bank.

collected from Sky Valley property owners [7], and the substantial possibility of increased value of the property. While all of the loan cannot be guaranteed to be repaid within twelve months, it is not unreasonable to conclude that the Debtor may be able to repay all or a substantial portion thereof within a reasonable period thereafter. That the repayment schedule may be somewhat uncertain is not fatal to Debtor's motion. *In re Dunes Casino Hotel*, 69 B.R. at 796.

Anchor Bank also argues Debtor's proposal for superpriority financing is in reality a plan of reorganization which Debtor is seeking to implement without complying with the requirements and procedures set forth in the Bankruptcy Code. This Court finds, however, that Debtor's proposal for superpriority financing is intended to be a short-term, stop-gap measure to enable Debtor to maintain and perhaps enhance the value of its property while undertaking to formulate, negotiate and bring to a confirmation hearing its overall plan for reorganization. The infusion of only $400,000 in capital into an enterprise valued at $10.5–12 million does not constitute a plan of reorganization. If it did, the provisions of 11 U.S.C. § 364 would be meaningless in a Chapter 11 context without further specific limitations within § 1129 on the use of § 364.

The superpriority loans will enable Debtor to preserve the resort and perhaps enhance its value. The failure to undertake the projects Debtor proposes could ultimately result in a diminution in value of the resort precipitated not only by deterioration of the property but also by forcing Debtor to liquidate or refinance some or all of the resort under duress, which actions may not be conducive to reaping results favorable to existing unsecured or subordinate lenders. *Snowshoe*, 789 F.2d at 1098, n. 7. Therefore, because Debtor has satisfied the requirements of 11 U.S.C. § 364(d) and because this court finds it to be in the best interests of the creditors and the estate, it is hereby

7. Debtor proposes an assessment of $30 per month on 1100 lot owners, or $396,000 in annu-

ORDERED that Debtor be allowed to obtain credit according to the terms and for the purposes hereinabove set forth.

IT IS SO ORDERED.

al fees to Debtor's estate.