**In re TIMBER PRODUCTS, INC., Debtor-in-Possession, and Robert L. McClintock, Debtor-in-Possession, Debtors.**

**Bankruptcy Nos. 89–01665, 89–01666.**
**Motion No. 89–7846–M.**

United States Bankruptcy Court, W.D. Pennsylvania.

May 17, 1990.

As Amended April 19, 1991.

Donald L. Phillips, James A. Prostko, Phillips and Galanter, P.C., Pittsburgh, Pa., for debtors.

Beverly Weiss Manne, Tucker Arensberg, P.C., Pittsburgh, Pa., for Pittsburgh Nat. Bank.

Robert L. Eberhardt, Asst. U.S. Atty., Pittsburgh, Pa., for Small Business Admin.

## MEMORANDUM OPINION

JUDITH K. FITZGERALD, Bankruptcy Judge.

Before the court is the Motion of the Debtors–in–Possession for Authority to Obtain Credit Secured by Liens pursuant to 11 U.S.C. § 364(d), a core proceeding. Objections were filed on behalf of Pittsburgh National Bank and the Small Business Administration, secured creditors. An evidentiary hearing was conducted following which the parties submitted proposed Findings of Fact and Conclusions of Law. Based on the evidence presented, the court finds that the Debtors have failed to sustain their burden of proof that PNB/SBA will be adequately protected if, in order to obtain the borrowing requested, the lien is granted. For that reason, the court is constrained to issue an order which denies the motion. This Opinion constitutes findings of fact and conclusions of law.

Factors to determine whether adequate protection is offered predicated upon the existence of any equity cushion include:
(i) Does the accrual of interest erode the equity cushion;

(ii) Is the property depreciating or increasing in value;

(iii) Has the Debtor shown an inability to obtain refinancing since the filing;

(iv) Has the debtor offered any other method of adequate protection;

(v) Do current economic conditions suggest no realistic prospect for successful rehabilitation or reorganization under Chapter 11; and

(vi) Has the Debtor's conduct of the litigation been more than a deliberate delaying tactic.

*In Re Southerton Corp.*, 46 B.R. 391, 398–400 (M.D.Pa.1982). The court has considered such of these factors as are applicable in this case. Factors five and six do not apply here; Debtors may be able to reorganize given additional funds and Debtors have not deliberately delayed the case.

Pittsburgh National Bank, SBA and the other participant lenders [1] (hereafter "PNB") are secured creditors of the Debtors–in–Possession and hold first liens on all the assets of Timber Products and McClintock (hereafter referred to as "Debtors"). The liens were granted to PNB in 1986 following issuance of a loan in the principal amount of $600,000.00 to Timber Products and its affiliate, Lumber Associates.[2] McClintock, sole shareholder of Timber Products, and his wife signed personal guarantees for the loan. The debt was incurred to finance construction of Debtors' operating facility for the purpose of manufacturing and processing hardwood lumber. Building costs exceeded the amount of the loan, and PNB authorized an additional $100,000.00 borrowing.[3] Despite the additional money, the Debtors could not begin full operations because they had insufficient cash to purchase inventory and to provide working capital. Debtors did operate from August 1988 to March 1989 on a limited basis primarily processing wood for one customer, Babcock Lumber.

However, the limited operation was not sufficient to enable Debtors to attain profitability. Debtors still are in need of cash to purchase, process, and sell sufficient lumber so that after they collect the accounts receivable they can service their monthly debt. It is that cash which Debtors hope to generate pursuant to the instant motion. Debtors have never purchased any significant amount of raw material or engaged in the sale of their own finished products.

The Debtors and Lumber Associates defaulted on their obligations to PNB, following which judgment by confession for $891,592.93 was entered against them pursuant to the various notes and guarantees. PNB commenced execution proceedings and a sheriff's sale of the facility was scheduled for March 16, 1989, but was postponed because on March 13, 1989, Debtors filed a lender liability action which is pending in the District Court. The bankruptcies were filed under Chapter 11 on June 21, 1989. Debtors have not operated post-petition. In December 1989, the Debtors filed a Disclosure Statement and Plan of Reorganization, which have been amended and which are pending hearing. The funding for the Plan is dependent upon Debtors obtaining sufficient new capital.

Bruceton Bank has agreed to lend Debtors an amount up to $275,000.00 but only if it receives primary lien status for the entire extension of credit under 11 U.S.C. § 364(d). Bruceton Bank's commitment to the Debtors is as follows: the loan will be a combination term and line of credit. The term portion will be $150,000.00 of which only interest will be payable for 12 months. The principal then will be amortized over 24 months, requiring monthly payments of $6,250.00 each in principal plus interest beginning in month thirteen of operations. The remaining $125,000.00 of the extension

---

**1.** Pittsburgh National Bank, the Small Business Administration and several other banks were participant lenders in a loan transaction. Only Pittsburgh National Bank and the Small Business Administration have filed objections to the instant motion.

**2.** Lumber Associates was to provide managerial and sales services for Timber Products. It has no assets and has never operated. It has not filed under Title 11.

**3.** The reason for the excess costs is disputed in litigation pending before the District Court in the Western District of Pennsylvania.

of credit will be a revolving line which will be reviewed and renewed annually.

The Debtors made many efforts post-petition to obtain conventional financing from other sources, secured and unsecured, but were unable to do so. Debtors have satisfied the first element of § 364(d) which is that they are unable to obtain credit other than by offering a senior or equal lien on property of the estate which is already subject to a lien.[4]

All participant lenders have agreed to subordinate their first position security interests in inventory and accounts receivable. Currently, there are no accounts receivable or inventory. PNB does not agree to subordinate its primary security interests in the equipment and real estate currently owned by Debtors.[5] The lenders assert that these interests would not be adequately protected if they were subordinated to Bruceton Bank.[6]

Testimony initially centered on the fair market values of the facility and of McClintock's residence. Concerning the home, the court accepts the testimony of Debtors' appraiser that the fair market value is $311,000.00.

Concerning the facility, PNB produced Stanford Davis, an expert, who placed a fair market value on the land, buildings and equipment, absent forced liquidation, of $1,257,425.00. In liquidation his opinion was that the proceeds of sale would be about $565,750.00. Debtors produced no expert witness concerning a fair market value assessment of the facility. However, McClintock testified that in his opinion the total current market value of plant and equipment in its present condition (that is, while the plant is not in operation) is $1,708,647.00.[7] His opinion as to market value was based upon his experience in the lumber business and his own purchases of new and used equipment for this plant and other plants.

Based on all of the evidence presented, the court finds the fair market value of the facility, including land, buildings and equipment, to be $1,400,000.00. The court cannot accept McClintock's estimate in all of its particulars because McClintock based his opinion of value for many of the items on a replacement cost basis. Much of the equipment was purchased used and the replacement method does not establish fair market value. Similarly, the appraiser for PNB based part of his opinion on the fact that the facility has not operated for a year and that the equipment may be depreciating in book value terms because of disuse. The court credits McClintock's testimony as to the efforts he has made to keep the equipment in usable condition and finds that the depreciation is of minor significance to a determination of present fair market value.

The parties agree that the facility's use is restricted to lumber processing. Stanford Davis testified on behalf of PNB that there are a number of saw mills on the market, thereby diminishing Debtors' prospects for sale. Debtors' plant, however, contains a unique feature in that its boiler system has been specifically designed to make use of the plant's waste byproducts. Under normal operation, all heat necessary

**4.** McClintock also attempted to raise capital through a possible joint venture but would not agree to the terms proposed by the prospective investors. However, he has not exhausted all forms of financing in exchange for an equity position in the company.

**5.** A second lien is held by S.P.E.D.D., which has agreed to subordinate its position.

**6.** The Court previously authorized Debtors to grant a $5,000.00 superpriority to the accountant retained in order to prosecute this motion. Although PNB is subordinated to that debt, there was and is adequate protection for the $5,000.00 priority.

**7.** Debtors provided an appraisal performed by Industrial Appraisal Company for insurance purposes which established a reproduction value and a net sound insurance value, neither of which are relevant to the court's determination of fair market value. Further, McClintock testified that, in his opinion, the plant would be worth about two million dollars if in operation because it would present a better picture to prospective purchasers. However, there was no evidence of capitalization rates which would be of paramount interest to buyers of an industrial plant. There is no evidence of record, other than his opinion, to substantiate a value of two million dollars and the court does not accept that opinion as credible.

to fire the kilns will be supplied by the burning of the waste wood products produced in the manufacturing process. This fact should be an added draw to prospective purchasers, assuming a willing seller and a willing buyer on the open market, because the cost of operation, over time, will be less than it would be in other similar plants. However, the market value is not likely to increase appreciably over the $1.4 million value, even if the plant is in operation, inasmuch as the borrowing is not designed to improve the plant but is to provide start-up costs such as insurance and utility deposits and to generate inventory. Rather, the plant and its equipment as currently constituted will depreciate.

The combined fair market value of residence and facility is $1,711,000.00.

■ The parties do not dispute the debt which must be considered against these assets for purposes of determining the existence of an "equity cushion." [8] They can be summarized as follows:

| Creditor | Approximate Balance |
|---|---|
| PNB | $ 904,000.00 +[9] |
| First National Bank & Trust (first mortgage on house) | $ 32,000.00 |
| Accountant (superpriority lien) | $ 5,000.00 |
| Post-petition Real Estate Taxes | $ 4,600.00 |
| Mechanics Lien (Snows) (disputed by debtors) | $ 8,077.00 |
| Pittsburgh National Bank (lien on residence disputed by Debtors) | $ 122,764.00 |
| TOTAL | $1,076,441.00 +[10] |

Subtracting the liens from the fair market value shows that there is approximately a $634,559.00 "equity cushion" in the property. Debtors seek to borrow up to $275,000.00 from Bruceton Bank. Of that sum, approximately $60,000.00 would be used for start-up expenses. The balance of $215,000.00 would be used to purchase inventory which would be processed at the facility and sold to generate accounts receivable. If PNB's liens were subordinated to that of Bruceton Bank, the equity cushion would be reduced by at least the $60,000.00 for start-up and potentially by the full $275,000.00. Thus, the equity cushion would be between $574,559.00 and $359,559.00, less accruing interest. Even if only $60,000.00 were subtracted, the cushion is insufficient to support this borrowing in light of other factors discussed below.[11]

**8.** The amount of equity between a debtor's obligation to the creditor including consideration of senior obligations and the value of the property is the "equity cushion." Where the cushion is great enough, it may constitute part of the adequate protection at issue. *See, e.g., In re Sky Valley, Inc.,* 100 B.R. 107 (Bankr.N.D.Ga.1988); *In re Dunes Casino Hotel,* 69 B.R. 784 (Bankr.D. N.J.1986).

**9.** As of March 20, 1990, the principal and accrued interest due to PNB was $904,134.32. Interest accrues on the two loans at the combined daily rate of $245.83.

**10.** In addition, S.P.E.D.D. has a junior lien exceeding $184,681.00 against the property which is not considered for purposes of determining whether there is an equity cushion as to PNB.

**11.** Section 361(3) of the Code is flexible and has provided courts with the opportunity to find various methods of protection to be "adequate" in relation to equity cushion. For example, in *In re First South Savings Association,* 820 F.2d 700 (5th Cir.1987), the court found that the increase in value of collateral generated by improvements resulting from § 364(d) financing could constitute adequate protection, but concluded that Debtors' projections did not support a finding of such an increase in value. In *Bray v. Shenandoah Federal Savings & Loan Association (In re Snowshoe),* 789 F.2d 1085 (4th Cir. 1986), the court determined that an equity cushion of approximately six million dollars against claims of thirteen million dollars was adequate protection when coupled with the Trustee's proposed repayment of the § 364(d) loan within five years. In *In re Sky Valley, Inc.,* 100 B.R. 107 (Bankr.N.D.Ga.1988), the court found that the first priority security holder, Anchor Bank, was protected by an equity cushion of more

■ The parties have agreed that because PNB is an oversecured creditor, interest continues to accrue against its loans at the current rate of $245.83 per day or $89,727.95 over 365 days. Without payments, the equity cushion will erode, thus, Debtors have offered payments to PNB pursuant to the proposed plan of reorganization as additional adequate protection. Debtors' original plan proposed to pay PNB $9,908.00 per month. Debtors amended the plan when, upon reevaluation, they realized that a payment of between $15,000.00 and $16,000.00 per month would be necessary to amortize the PNB loan assuming a prime interest rate between 9½ and 10½ percent. Debtors' contractual rate is 2.75 percent above prime. Debtors now propose a repayment of $13,000.00 per month to PNB for 12 months with the balance of the loans amortized over the next 66 months. In that manner, the full balance due to PNB would be paid on or before the original maturity date of February 25, 1997. To accomplish this, Debtors must show a reasonable likelihood of generating the cash necessary to fund the repayment plan.[12] The fundamental issue in the case, therefore, involves whether or not the proposed borrowing will enable the Debtors to operate the facility profitably. If so, PNB will be adequately protected. If not, PNB's position is in jeopardy.

In support of Debtors' position McClintock established that he has received from one major supplier a commitment to grant Timber Products right of first refusal on certain items of inventory at market prices on net ten day terms. In addition, McClintock's contacts throughout the industry would enable Timber Products to develop a customer base for its products.

PNB presented a Certified Public Accountant, Lawrence Ranallo, who testified as an expert. He analyzed Debtors' original Plan of Reorganization and the Amended Plan and concluded that Debtors could not operate profitably with the proposed borrowing according to the projections in either plan. This opinion will discuss only the Amended Plan, which still contains major flaws. For example, it fails to make allowances for federal, state and local income taxes, which could be substantial.[13] Moreover, there is no contingency for emergencies, expansion, uncollectability of accounts receivable, delays in production schedules or delays in turnaround times from inventory to sales. Ranallo has several clients who are involved in the hardwood and dimension lumber industry and has experience with their financial affairs. He testified to certain industry-wide financial standards. In nearly all cases, Debtors' estimates of what they can produce and how much they can expect by way of a return on sales exceeded the industry standards. For example, Debtors' plan assumes a 19 percent return on sales, whereas the industry median is 6 percent. The plan also fails to consider the consumption of cash for interest payments and other ongoing expenses which will accrue before accounts receivable are collected.

The plan makes assumptions which are below industry averages: (1) a seven-day period to convert certain green lumber into finished inventory[14] and (2) a thirty-day

than 5.7 million dollars. That fact, coupled with the relatively small size of the loan sought by Debtor and Debtor's proposal to repay the § 364(d) loans promptly provided adequate protection. In *In Re Southerton Corporation*, 46 B.R. 391 (M.D.Pa.1982), the court noted that "the proposition that a uniform equity percentage or dollar amount would inevitably supply adequate protection conflicts with the principle of considering the adequacy of protection in light of all the facts surrounding the case and the equitable considerations to which those factors give rise. (Citations omitted.) If properly applied, the concept of an 'equity cushion' supplies only one factor in determining whether the creditors' interest is adequately protected." (Citation omitted.) *Id.* at 398.

**12.** Because Debtors' plan proposes to pay the real estate taxes over time rather that at confirmation, they and the other debts listed on the chart will remain senior liens to PNB.

**13.** Ranallo calculated the blended federal tax rate to be about 34 percent, less deductions, based on Debtors' projection of income.

**14.** Processing time varies widely depending upon the type of wood, its pre-dried condition, the quality of the available equipment, and the skill of employees. No attempt is made in this opinion to restate all variations, merely to illustrate that regardless of the type or condition, McClintock's estimates of how quickly Timber

turnaround time from delivery of inventory to collection of accounts receivable. Ranallo testified, and we accept as a fact, that the industry average is closer to fourteen days for the same wood production and forty-five days for collection of receivables from credit-worthy customers. The plan also fails to project labor costs at current rates. The plant would employ several people at minimum wage but must have skilled labor as well. The cost of the skilled labor anticipated by the plan is less than that which is paid by other employers in this industry even though the skill of the person involved in the cutting operation is a significant factor in achieving the yields projected. McClintock testified that he believed he would be able to obtain laborers at the projected cost because the economy of the relevant market area is depressed. The court finds, however, that the skilled labor costs are understated over the life of the plan based on the sums paid throughout the industry. Although the difference in dollar amount is not significant enough to make or break the plan, this is one more example of McClintock's exaggerations of yields and margins and minimizations of costs.

One of the operations which the facility would perform is converting cants into lumber. Once the conversion to lumber is completed to create the finished product (dimension lumber), the wood must be dried, straight line ripped, cut to length, trimmed, sorted, packaged and shipped. The drying process is completed through a kilning operation, the duration of which depends on the type of wood involved. Ranallo disputed the allowed charges for kilning costs in the proposed plan of reorganization. However, the facility was designed to minimize kilning costs by allowing the boilers to be fueled by the plant's wood waste byproducts. McClintock prepared an itemization of the actual kilning costs he had incurred during the few months of partial operation. The court accepts McClintock's estimate of kilning costs.

The major dispute involves the yield to be attained in the conversion process from cants to lumber and profit margins from the ultimate sales of the finished product. McClintock projects that Timber Products will be able to generate a 63 percent gross profit from its sale of finished lumber generated from cants.[15] This figure contrasts sharply with the industry average of 24 percent gross profit on sales of lumber which began as cants. In part, his estimate is based on his perceived ability to generate a 70 percent yield from cants. Ranallo testified that a more realistic assumption of the yield would be 60 percent because producing lumber from cants is riskier than certain other lumber cutting operations. Although the industry has set standards for cant quality, the yield is dependent on the actual grade, unobservable defects, the skill of the employee cutting, the type of saw used, and other factors. The court finds that Debtors' estimated ability to achieve a 70 percent yield is unrealistic.

Another disputed area concerned whether or not the Debtors' anticipated costs of raw materials was reasonable and whether or not freight charges had to be added to those prices. The cost of raw materials was based upon a publication known as the "Hardwood Market Report" [hereafter HMR], which reflects trends in the industry and reports average prices for many types of wood to be purchased. McClintock and Ranallo agree that some purchases would be at higher prices and some at lower than those listed in the HMR. In all cases, however, the HMR lists prices without freight charges added.[16] The industry average freight charge is $35.00 per thou-

Products can convert its raw materials into saleable inventory is shorter than industry-wide times.

15. Moreover, Ranallo testified, and the court accepts, that processing cants into dimension lumber is not an accepted industry practice. If it were as profitable as Debtors project, Ranallo opines that other large producers in the lumber

industry would make a regular practice of this conversion, but do not.

16. Freight charges for deliveries out of the facility and to the customer are not at issue inasmuch as the contracts can pass the costs to the customer.

sand board feet. Debtors' plan includes no sum for any freight charges and assumes the ability to purchase raw materials at or below HMR. McClintock opined that he will be able to obtain prices at less than the HMR listings without having to pay freight to have the lumber shipped to the Timber Products facility. He stated that he had purchased some lumber during the limited period of operation on those terms. The court finds that it is overly optimistic to (1) fail to include freight to the plant for *all* purchases when the industry practice is to charge freight and (2) assume that *all* purchases of raw materials, without freight added, will be at or below HMR listings.

Debtors anticipated a gross margin which was well in excess of the industry standards. Gross margin is the difference between (1) the total cost to produce the product including purchase price of raw materials, electricity, labor, and other direct costs of production and (2) the sales value of the product. Debtors' plan assumes a gross margin nearly double that of the industry average. Red oak was used to illustrate this point.[17]

One of the types of wood which the facility would utilize is red oak. Ranallo testified that the median gross profit for red oak operations is 24 percent, whereas McClintock's plan anticipates 49 percent. The costs of raw materials, kilning, and processing are all factored in to the gross margin. Because the purchase and processing costs are understated in the plan, the gross profit anticipated is overestimated.

Simply put, the problem presented by this plan is one of an inadequate supply of cash to enable the Debtors to start operating the way the plan proposes. The anticipated borrowing of $275,000.00 is insufficient to cover the Debtors through the first several months of operation, during which costs of inventory purchases will be high, turnaround time for processing and selling will be ongoing, resulting in the generation of few, and collection of no, accounts receivable. Even after accounts receivable are generated, Debtors will incur additional time delays for collection of the receivables. Debtors' projections are not supported by the weight of the credible evidence and Debtors' proposed plan will require more cash than $275,000.00 in order to generate, within a reasonable time period, profits sufficient to repay its debts and to provide adequate protection to the creditors whose secured status is to be subordinated to the new lenders. The plan provides for a short turnaround time for processing raw goods into finished products in derogation of industry averages, and for converting accounts receivable into cash. The plan provides no contingency for major repairs of equipment which has been idle now for more than a year or other unforeseen delays or necessities. Although the equipment has been kept in good condition, it is not realistic to assume that every piece will work without repair or significant maintenance expense until the Debtors generate sufficient funds to resume payments to the secured creditors. In use, and over the life of the plan, the equipment will depreciate. Debtors' plan assumes that Timber Products will be able to secure enough contracts for a finished product and to find in the marketplace, as needed, the type of raw material, at prices contemplated by the Plan, needed to fulfill the contract. If either event were not to occur, that is, if Debtors experienced some delay in obtaining the type of wood necessary as raw material to fulfil a particular order or if Debtors were unable to obtain a customer for the wood which was available, Debtors would be out of business. Debtors take neither of these contingencies into consideration in their assumptions regarding turnaround time and other aspects of the process.

Debtors must operate at or near capacity to meet plan projections. In fact, Debtors

---

**17.** According to testimony, costs of production of red oak and turnaround time were greater than those for poplar which also would be used in Debtors' operations. However, at trial red oak was used as another example of the unreliability of McClintock's estimates which did not come close to industry experience and the bases for which were not supported by the weight of credible evidence.

acknowledge the eventual need for certain improvements to the facility, including additional storage space, to enhance capacity. If Debtors could turn over inventory as rapidly as projected, storage is adequate but, once again, McClintock expects to better the industry averages. There is no factual basis on which to conclude Debtors can do so. If they cannot, they need to store finished product while producing more and do not have adequate storage space to accomplish both tasks. The anticipated borrowing would not enable Debtors to make improvements.

Although the court recognizes that no plan can perfectly account for all future events, when the issue is one of adequate protection for a secured creditor whose primary lien is to be subordinated, the analysis of what is adequate necessarily must include some assessment for contingencies. Debtors ignore all potential negative contingencies and are overly optimistic regarding the basic expenses to be incurred. In that sense, the proposed repayment plan is unrealistic. It is speculative in light of the absence of an operating history and is inconsistent with industry averages and performances. *See, Matter of St. Petersburg Hotel Associates, Ltd.,* 44 B.R. 944 (Bankr. M.D.Fla.1984) (borrowing not permitted where assumptions about its effect are highly speculative and based upon unrealistic expectations).[18]

That is not to say that in all circumstances this plan would fail. Even Ranallo acknowledged that given sufficient operating capital, the plant could be profitable and the Debtors could be expected to reorganize. The situation facing the court, however, is that Debtors are asking to borrow what they believe will be sufficient capital to provide for their start-up expenses and to carry them through the first six to nine months of their operations. The $275,000.00, of which $215,000.00 would be available for inventory purchases, simply is inadequate to fund Debtors' start-up in the manner proposed in view of industry experience and does not offer adequate protection to PNB. Ranallo's estimate, which we credit as modified in this opinion, was that within six to nine months Debtors would run out of cash and would be operating on a negative cash flow basis. Without payment, the subordinated creditors will not be adequately protected. The equity cushion is inadequate because of the unlikelihood that Debtors will meet projections, the accrual of interest which will erode the cushion, and the facility's depreciation in value over time. Further, Debtors propose to begin payments to the secured creditors only after four months of operation when Timber Products expects to begin to collect its accounts receivable in a sum sufficient to allow payments to be made. Thus, for four months the creditors whose liens are to be subordinated would receive no payments, additional interest would accrue, and Debtors will have incurred $275,000.00 worth of additional debt.[19] If Debtors' projections and assumptions were more realistic, the court might be able to find that the equity cushion was sufficient to provide the Debtors the additional four months' breathing space before beginning payments to the secured lenders. However, on this record, we cannot so find.[20]

**18.** We do not conclude that Debtors' assumptions are *highly* speculative but find that the expected returns are unrealistic based on the available borrowing for purposes of the matter at issue.

**19.** The inventory itself would be security for Bruceton Bank which would have the first position on inventory and accounts receivable. However, the debt service would escalate to include the interest on the loan and the subordinated lenders' position still would be at risk for the full unpaid balance owed to Bruceton Bank.

**20.** In *In re Southerton Corp.,* the court determined that adequate protection on the basis of an equity cushion alone did not exist. First, the accumulation of interest on the debt eroded the debtor's margin of equity, which was slim. Second, the record did not support a finding that the property would significantly increase in value. Third, debtor had demonstrated an inability to obtain postpetition financing. Fourth, there was no other "indubitable equivalent". 46 B.R. at 399–01. Debtors herein face the same problems. Interest is eroding the equity cushion; no provision has been offered to maintain the equity cushion at the level at which it currently stands; Debtors' proposed periodic payments to the subordinated lenders would reduce the debt significantly over the plan period but the payments are based upon future sales.

An additional concern to the court, albeit one which might be curable, is that the $275,000.00 loan was to be authorized without any restrictions or eligibility qualifications concerning inventory and accounts receivable levels. Such an unrestricted borrowing is not consistent with normal banking practice and is untenable where the interests of other secured creditors are to be subordinated because of it.[21]

An appropriate order will be entered.

Debtors' anticipated profit margin from those sales is unrealistic based on industry averages.

21. The Supplemental Proposed Findings of Fact submitted by PNB include a section called "C. Proposed Restrictions on Borrowing". The court does not consider these proposed findings of fact in light of the opinion issued herewith. Further, PNB requests the admission into evidence of an additional document which is available within the industry. However, the offer is conditioned on Debtors' offering evidence of availability of additional borrowing, equity infusion, and/or adequate protection. To date, Debtors have made no such offer. Therefore, the offer into evidence is refused without prejudice.