In re Joseph M. NESSER, Debtor.

FAYETTE BANK, Movant,

v.

Joseph M. NESSER and Carl P. Izzo, Jr., Respondent.

Joseph M. NESSER t/a Lash Sporting Goods, Plaintiff,

v.

BOSTON RESTAURANTS—PA., INC., and Michael J. Forte, Defendants.

BOSTON BEANERY RESTAURANTS, INC., Boston Restaurants—Pa., Inc., and Michael J. Forte, Movants,

v.

Joseph M. NESSER, Respondent.

Joseph M. NESSER, Movant,

v.

U.S. DEPARTMENT OF THE TREASURY, Internal Revenue Service, The Commonwealth of Pennsylvania, Department of Revenue, and Department of Labor and Industry, and The Pennsylvania Liquor Control Board, Respondents.

In re Joseph M. NESSER, Debtor.

Bankruptcy Nos. 95–23886 JKF, 94–20147 JKF.

Motion Nos. JPV–2, DHP & W–1 and GWS–3.

Adversary No. 96–2037.

United States Bankruptcy Court, W.D. Pennsylvania.

March 7, 1997.

Gary W. Short, Pittsburgh, PA, for Debtor.

John P. Vetica, Jr., Pittsburgh, PA, for Fayette Bank.

Peter N. Pross, Diefenderfer, Hoover, Pross & Wood, Pittsburgh, PA, for Boston Restaurants—Pa., Inc., and Michael J. Forte.

## MEMORANDUM OPINION [1]

JUDITH K. FITZGERALD, Bankruptcy Judge.

There are several matters before the court: (1) the motion filed on behalf of Fayette Bank to revoke the order of discharge entered in Debtor's prior chapter 7 case and to reopen the chapter 7 [2] filed at Bankruptcy No. 94–20147, Motion No. JPV–2; (2) the motion of Boston Restaurants—Pa., Inc. and Michael J. Forte (hereafter "Forte") to dismiss an adversary proceeding filed against them by Debtor in the chapter 13 case, Bankruptcy No. 95–23886, Adversary No. 96–2037 [3]; (3) the motion to dismiss the chapter 13 case or, in the alternative, to reopen the chapter 7 case, filed on behalf of Boston Beanery Restaurants, Inc., Boston Restaurants, and Forte, filed at Bankruptcy. No. 95–23886, Motion No. DHP & W–1; (4) the motion filed on behalf of Debtor to permit him to incur additional debt, Bankruptcy No. 95–23886, Motion No. GWS–3 (Emergency Motion for Authorization to Obtain Credit Pursuant to 11 U.S.C. § 364(d); and (5) objections to confirmation of Debtor's Second Amended Chapter 13 Interim Plan.

## PLAN FEASIBILITY

■ The plan requires a source of funding. Debtor's only current source of income to fund the plan is derived from his operation of a business known as Lash Sporting Goods. Debtor concedes that his current income will not fund the plan. Debtor cites three other potential sources of plan funding: (1) operation of Joey's South Street Pub, to be opened if Debtor's motion to incur debt is granted; (2) the value of his stock interest in Boston Restaurants—Pa.; and (3) a cause of action against Forte and Boston Restaurants—Pa. Boston Beanery, Boston Restaurants—Pa., and Forte allege that Debtor does not have a regular income because Debtor's original restaurant has not operated since 1994, he is receiving no income from Boston Restaurants—Pa., and is seeking to borrow money to open a tavern which he contends will provide him with sufficient income to fund his plan.

Evidentiary hearings were conducted on these matters, including plan confirmation, on March 5, March 20, and March 29, 1996. Debtor operates Lash Sporting Goods which provides him with nominal income. This has been his only employment since October 1994 when his chapter 11 converted to chapter 7. This income is insufficient to support him. He lives in his mother's home and, although he pays no rent, he contributes what he can, as he can, to household expenses, usually

---

1. The following Memorandum Opinion constitutes this court's findings of fact and conclusions of law. The court's jurisdiction was not at issue.

2. The case at Bankruptcy No. 94–20147 was filed under chapter 11 on January 19, 1994, and converted to chapter 7 on October 18, 1994. Debtor received a chapter 7 discharge on February 14, 1995.

3. The motion is entitled "Defendants' Motion to Dismiss Complaint, Motion to Join the Internal Revenue Service as a Party, Motion for a More Definite Statement and Motion to Strike Immaterial Matters from Complaint". Because of our disposition of the motion to dismiss the complaint, we do not reach these other issues.

between $50 and $100 monthly. He was in default on his automobile loan and the car has been repossessed. Debtor has no checking or savings account and does not pay rent for the Lash Sporting Goods facility because family members own the building. The chapter 7 trustee, Carl Izzo, testified that Debtor's income from Lash Sporting Goods was very little. Mr. Izzo also testified that, because the chapter 11 was converted to a chapter 7, he had to shut down Lash Sporting Goods from which Debtor obtains his income. However, Debtor testified on direct examination that he is still operating and his monthly income before taxes from Lash is and has been about $250 per month. *See also* note 6 *infra.*

The version of Debtor's plan that was current at the time of trial, Trustee Exhibit T–1, dated December 14, 1995, provides that he shall pay the trustee $508.78 per month. He made the $508.78 plan payment in January of 1996, paid nothing in February and $187.15 in March of 1996. Debtor had to borrow the money to make these plan payments. Although Debtor had surrendered his vehicle to GMAC at the time of trial, the plan had not been amended to exclude the payment to GMAC.[4] He testified that his monthly take-home income from Lash Sporting Goods is approximately $250 before taxes and that his living expenses are $200. He spends six or seven hours a day at the store. There is no way, therefore, that Debtor can pay $508.78 per month from his own income to the trustee, and Debtor acknowledges this fact.[5]

4.  On March 22, 1996, Debtor filed a Third Revised Chapter 13 Plan providing for a different payment schedule of $161.13 in months 1 to 12, $1,129.70 in months 13–24, $70,000 in month 24, and $1,766.89 in months 25 to 60. This Plan deleted the payment to GMAC due to the repossession. The Debtor's ability to fund the dramatic increases in payments is not supported by the evidence. Debtor testified that his projections concerning the Second Amended Chapter 13 Interim Plan (Debtor's Exhibit 8) were for one year because he had no information for later years and nothing to demonstrate his ability to make the larger payments proposed in the Third Revised Chapter 13 Plan.

5.  With respect to expenses for Lash Sporting Goods Debtor testified that he did not pay insurance in 1995 because money was too tight and he had only $200 worth of inventory there. The building was owned by other family members so

Debtor has no personal assets with which to purchase inventory for the tavern start-up and for this he has filed a motion to incur debt which is discussed *infra.* Debtor also expects to be able to renew the liquor license for the tavern, for which he must borrow money. *See* note 31, *infra.* At the time of trial, Debtor had not been filing monthly operating reports although he knew he is required to do so.[6]

### Joey's South Street Pub

Debtor contends that reopening the tavern on South Street as Joey's South Street Pub will provide sufficient income to enable him to make plan payments but his projections are not supported by the testimony and evidence. Debtor has had limited managerial experience.[7] Debtor testified that income from Lash Sporting Goods has declined in recent years. He attributes this to his devotion to the restaurant business, although we note that Debtor has not worked in the restaurant business since 1994, with no significant increase in Lash's net income.

Debtor had a Boston Beanery franchise on South Street in Uniontown, Pennsylvania, which began operations in October, 1989. It has not operated since 1994 and, between 1990 and 1994, continually lost money. Debtor also is a 50 percent shareholder in another restaurant, Boston Restaurants— Pa., Inc., with Michael J. Forte. Boston Restaurants—Pa. operates in the Uniontown

he did not pay insurance on the building. He projects utility costs at $840 a year but his 1994 tax return states a cost of $2,790 and the 1993 return states $3,475. In 1994, supplies totaled $700. Projections for 1996 are $600 for miscellaneous.

6.  Since trial, Debtor has filed monthly operating reports only for the months of March, April, June, August and September of 1996. They show that his income is derived solely from Lash at monthly net amounts ranging between $1,067 in June, 1996, and $345.74 in August, 1996.

7.  When the South Street location was Lash's Tavern, before Debtor took it over, he was a bartender and had some management responsibility. When he converted it to the Boston Beanery and operated it as a full service restaurant, it operated at a loss.

Mall. Boston Restaurants—Pa. is a franchise of Boston Beanery. The Boston Restaurants—Pa. shareholder agreement provides that Boston Beanery shall make all management decisions for its franchisees. Forte is the 100 percent shareholder of Boston Beanery.

Debtor testified that before the Beanery operated at the tavern site, the family tavern which had been operated there by Debtor's father for many years had 1200 customers a month. At that time the tavern had a large take-out business. Debtor testified that when he took it over he renamed it Nesser's Tavern. After operating it for several months, he closed it for three months while he transformed it into a Boston Beanery restaurant in order to attract clientele different from that which had frequented the tavern. Debtor recalled that this occurred in 1989 or 1990.[8] The restaurant lost money.[9] In October, 1992 Debtor and Forte became shareholders in Boston Restaurants—Pa, located at Uniontown Mall. Debtor's South Street business, Boston Beanery, suffered greater losses once the mall restaurant opened.[10] Debtor contended that the losses were caused by the fact that the two restaurants were too close together, thereby caus-

ing competition between the stores. However, Forte testified that there is a 25–mile limit for multiple stores which is in effect for three years. Forte testified that the three years applicable to Debtor's downtown store expired before the Mall store opened in November of 1992. We credit his testimony.

If Joey's South Street Pub were to open, it would not use the entire space that the former tavern or restaurant had occupied and the seating capacity would be only 88 customers, including bar stools. If the Pub opens, Debtor anticipates 270 customers per week which is significantly less than the former tavern attracted. Only snacks such as chips and pretzels will be served. The proposed facility has no kitchen, no refrigerator, grill or stove, hot plate, microwave, or dishwasher. There is a sink to wash glasses. There is no hood ventilation system so cooking will not be possible in the future without further renovations.

At trial Debtor testified that he estimates that it will cost $25 to $30 in supplies, other than liquor, beer and food, to get the bar open and $10 to $15 monthly to replace those supplies for a total of $200 to $300 per year.

---

8. Boston Restaurants—Pa. Exhibit 25 states that Debtor owed franchise fees beginning in November, 1989. Michael Forte testified that Debtor opened the restaurant in October of 1989.

9. Debtor testified that, with respect to the South Street Boston Beanery franchise he opened in 1989, he was required to pay royalties but did not make them on a regular basis. Boston Beanery filed a proof of claim in the chapter 11 concerning these royalties. Steven C. Jones was called as a witness. He is vice president of administration of Boston Beanery, Inc., and an agent for Boston Restaurants—Pa. but not a shareholder or director of the latter. He testified that, after Debtor filed the chapter 11, Debtor ceased making these payments and incurred approximately $6,000 in franchise fees during the chapter 11. (The proof of claim filed by Boston Beanery ® Operations, Inc., states that franchise fees of $111,968.05 are owed by Debtor for the period from November, 1989, through January 15, 1994. *See* BRP Exhibit 25.) When Debtor opened the downtown restaurant, Jones advised him on matters such as recording sales, administering the restaurant, etc. Jones testified that the $1,350 monthly payments made to Debtor and that Debtor claims were due him were arranged so that Debtor could pay his creditors. This amount was paid to Debtor for 14 months and

was discontinued when Boston Restaurants—Pa. started having financial problems of its own (taxes).

The Uniontown Mall store supplied Debtor's South Street restaurant with food but, after March 14, 1994, when Boston Restaurants—Pa. began having its tax problems, it required Debtor to pay for these supplies. Jones also testified that after this date Boston Restaurants—Pa. considered all money given to Debtor to be a loan. According to Jones, this was at Forte's direction. Through January 19, 1994, Debtor was given $33,448.30. Boston Restaurants—Pa. filed a proof of claim in Debtor's chapter 11 for $42,-644.62 for the period October 28, 1992, to January 18, 1994.

10. Fayette Exhibit 1, Debtor's 1990 tax return, Schedule C, shows $42,790 in losses on gross receipts of $338,703. Fayette Exhibit 2, the 1991 tax return at Schedule C, shows a loss of $9,812 on gross receipts of $305,590. Fayette Exhibit 3, 1992 tax return, Schedule C, shows a $6,724 loss on gross receipts of $283,392 and, for 1993, Fayette Exhibit 4, 1993 tax return, Schedule C, a loss of $10,776 on gross receipts of $196,976. In 1994 operating losses were $85,877 on gross receipts of $125,833. BRP Exhibit 13, Debtor's 1994 tax return, Schedule C.

However, Debtor's projected monthly income statement shows miscellaneous expenses of $200 a *month*, amounting to $2,400 per year. He also testified, regarding the projected income statement, that he has not projected expenses for repairs, maintenance, or cleaning but that they would be minimal.[11] This conclusion does not comport with other evidence of record, inasmuch as the 1994 tax return showed expenditures for repairs in the amount of $3,947. He has not included a cost for hazard insurance on the building [12] or liquor liability and contents coverage, debt service, or bonding costs for the liquor license.[13] He wants to improve the decor and make the tavern more upscale. He believes that higher prices and a remodeled interior will bring in more affluent clientele. The projections do not include an estimate of Debtor's living expenses.

Before trial, Debtor filed a projected income statement (BRP Exhibit 41) for the Pub. It shows net profits before taxes of $1,700 based on approximately 180 customers per week. At trial, these estimates were raised. Debtor testified that he expects $3,400 per month in income before taxes of about 33 percent, leaving approximately $2,266 to fund a plan to continue the business and cover living expenses. The plan payment as the plan existed at the time of trial is proposed to be $508.78 and Debtor's living expenses per month are currently $200.[14] He does not include the balance of approximately $1,500 as plan funding because he expects to increase his standard of living. The liquor liability insurance would be approximately $840 per year for $100,000 coverage. Liability insurance will be about $525, building coverage $1,130 [15], and contents $283. Insurance costs total $2,778 per year or $231.50 per month.[16] Adding in the proposed plan payment of $508.78 and Debtor's current $200 living expenses gives a total of $940.28. The plan proposes to increase payments after years 1, 2 and 4. However, testimony established that this is unlikely to occur unless debtor adds a kitchen. To add a kitchen, seating must be sacrificed.

Timothy Mahoney, called by Debtor, testified that he is a self-employed contractor and bar owner who has been in the bar business for 17 years. Mahoney testified that he is familiar with all aspects of tavern and bar operations. He receives 50 percent of his income from them.[17] He has bought, remodeled, and sold "beer gardens" after turning them into taverns or restaurants. He owns three himself, two in Uniontown, Pennsylvania, and one in Greene County, Pennsylvania. One of them, Mahoney's, is similar to Debt-

11. He projects utility costs (electric, gas, water, sewer, cable t.v. and telephone) at $365 a month or $4,380 per year.

12. The projections include a cost of $100 but this covers only fire and liability. Debtor testified that the building insurance is not included because he considers it a personal expense. Regardless, Debtor must show how he will pay for insurance on estate assets through his plan.

13. Debtor also testified that he had to pay a bonding fee as part of the liquor license renewal. This expense was not included as an operating expense on Exhibit 8. Debtor testified that, after Debtor filed this bankruptcy, his brother, Steven, borrowed the money from a bank and has been repaying it. He expects to be repaid by Debtor. There is no note between Debtor and his brother evidencing the loan and Debtor gave no security for the loan. The loan was not court approved. Debtor seeks to incur additional debt in the amount of $3,000 in order to open up the tavern. This matter is the subject of a separate motion which is discussed below. *See also* note 31, *infra.*

14. If these projections were credible, they would create a different issue regarding confirmation: i.e., that Debtor would not be contributing all of his disposable income to the plan. Debtor's Second Amended Chapter 13 Interim Plan provides a zero percent distribution to unsecured creditors. His desire to increase his standard of living is understandable but he currently has a rent-free residence and his lifestyle change cannot be at the expense of his creditors. There is nothing in the record indicating that his current living arrangements cannot continue until his plan is completed, thereby expediting the distribution rate to his creditors.

15. Debtor testified that he feels the building coverage is too high based on the value of the building ($18,000) and therefore the insurance coverage will be lower. Even without the building coverage, insurance costs will be $137.33 per month.

16. This figure excludes the $100 per month for fire and liability coverage.

17. The other 50 percent is from rental properties.

or's and is two blocks away from Debtor's proposed location. He testified that his taverns are now profitable but were not when he first took them over. He attributes his success to his own managerial skills. He is a hands-on manager at all three of his establishments. He hires all his employees, prices drinks and food, and determines cost controls. He is responsible for all accounting and money management at his operations. He would not manage Debtor's bar, however. In fact, he would be a direct competitor. At the time of trial he was in the process of buying another bar which is about 350 feet from Debtor's proposed tavern.

Although this witness testified that he assumed that even a "bad manager" could produce the projected revenue in Debtor's proposed location, the basis for this assumption was not explained and is not consistent with Mahoney's testimony that his own bars serve food whereas the tavern Debtor proposes to open does not have a kitchen. Mahoney testified that availability of food would increase business and allow operating at lunchtime. To add a kitchen would mean that Debtor would have to sacrifice seating which would prevent him from meeting his sales projections and would cost a significant sum of money. Moreover, Mahoney acknowledged that the success of a tavern depends on the entrepreneurial skills and hands-on management and renovations or upgrades made to the premises. He detailed his track record of successes. Debtor's history is not one of success and the court does not accept the inference that Debtor might be successful in this location because Mahoney might be.

*Value of Debtor's Boston Restaurants— Pa. Stock*

Plan feasibility also depends on the value and marketability of Debtor's Boston Restaurants—Pa. 50 percent stock interest. Boston Restaurants—Pa. is owned in equal shares by Debtor and Michael Forte. Its only business is operating the Uniontown Mall store.

There is no ready market for the stock. In the chapter 11 filed in 1994, Debtor listed the stock as having unknown value. On March 27, 1995, after the case was converted to chapter 7 and after the discharge order was entered, Debtor filed an amended Schedule C, Property Claimed as Exempt.[18] He stated in the amended schedule that the value of the stock was $500.[19]

The chapter 7 trustee, Carl Izzo, testified that he advised Debtor to get the stock valued but Debtor did not do so. Mr. Izzo also testified that he investigated whether to sell the stock and felt that a sale would have to result in gross profits of $115,000 for the estate to break even, accounting for costs of sale, tax liens, Debtor's $500 exemption, and the trustee's commission of approximately $3,000. This figure did not include consideration of the capital gains tax. Because of United States Trustee guidelines that prohibit sales of assets unless there will be funds available for unsecured creditors after the sale, and because Mr. Izzo believed that such funds would not be available, he did not bring a sale. Mr. Izzo also recognized that additional costs could accrue in light of the problems between Debtor and Forte which could result in litigation. Mr. Izzo declined Forte's offer to purchase the stock for $10,000 in light of the above factors. Mr. Izzo also testified that he knew that Debtor considered the stock to be worth more than the $500 Debtor listed in his amended schedules because he discussed the matter with Debtor. The stock was not worth $115,000, however, and would never be worth that much, in Mr. Izzo's opinion.

Forte filed a motion in the chapter 7 seeking abandonment of Debtor's stock because the chapter 7 trustee would not sell it through the estate. Forte had made an offer to purchase the stock for $7,500. This offer later increased to $10,000 and later to $25,000. Although there is documentary evidence to the contrary, which itself is in controversy due to a missing page, Debtor contends that he refused to sell the stock to

---

18. A previous amendment had been filed on October 27, 1994, after the conversion but before the discharge.

19. Simon John, Debtor's chapter 7 counsel, testified that he thought that $500 was a fair value for the stock based on the amount of tax liens that encumber this asset.

Forte for $25,000 because, in his opinion, it was worth $125,000, although encumbered by $110,000 in liens. The motion to abandon was granted but its effective date was stayed 30 days to let the parties try to resolve the valuation issue. The record does not reflect a resolution.

Notwithstanding this history, in his chapter 13 schedules Debtor again listed the stock and declared its value to be "unknown". Undaunted, a mere one year after having declared, under penalty of perjury, the value to be $500, Debtor now contends that his fifty percent interest is worth $166,000. To establish the stock's value, Debtor called John M. Dagnon, a CPA with Carbis Walker and Associates, a regional accounting firm handling smaller clients. Dagnon is in charge of business valuations and litigation support services for his firm. He is the partner in charge of the firm's audit section. Part of his practice involves valuation of small family businesses and restaurants, including several fast food chains. In order to form his opinion he relied on tax returns, unaudited balance sheets, lease and stockholders agreements, the license agreement between Boston Restaurants—Pa. and Boston Beanery, internal financial statements and journal registers in month-end files. He

did not talk to Debtor or to Boston Restaurants—Pa.'s management and was unaware of certain factors in this case that bear on valuation decisions.

Dagnon did not value Debtor's stock as such but valued Boston Restaurants—Pa. as a business. He employed the fair value approach, as opposed to the fair market value approach. The fair value approach uses equitable considerations and is often employed in the divorce context. It does not involve an arm's length analysis and assumes that a buyer will be found in a non-liquidation setting. Fair value is personal to the seller. Its focus is on what is fair and equitable when an owner is involuntarily deprived of the benefit of an asset when no willing buyer and seller exist. Dagnon opined that the fair value concept is appropriate in the context of the equities between Forte and Debtor and that this is a common approach in dissenting shareholder situations.[20] This approach would have merit if this were a case which met the assumptions stated. This, however, is not a situation in which Debtor was involuntarily deprived of the benefit of his stock,[21] nor is it a dissenting shareholder situation.

Dagnon's report is Debtor's Exhibit 15. He valued Boston Restaurants—Pa. at $331,-

---

**20.** The Pennsylvania Business Corporation Law of 1988, effective October 1, 1989, provides that a "dissenter" is a shareholder who is entitled to and asserts dissenter status and has performed every act necessary to lay claim to that status. 15 Pa.Cons.Stat.Ann. § 1572. Dagnon conceded that he did not know whether Debtor met the standards of § 1572. Even if Debtor could be considered a dissenting shareholder, there is no evidence that he has satisfied any of the conditions to be entitled to exercise dissenters' rights. See 15 Pa.Cons.Stat.Ann. § 1103, § 1571 et seq. Furthermore, Debtor does not have standing to sue Boston Restaurants—Pa. or Forte for his own benefit. Section 1717 of the Business Corporation Law provides that

The duty of the board of directors, . . . and individual directors under section 1712 . . . is solely to the business corporation and may be enforced directly by the corporation or may be enforced by a shareholder, as such, by an action in the right of the corporation, and may not be enforced directly by a shareholder or by any other person or group.

15 Pa.Cons.Stat.Ann. § 1717.

**21.** Debtor contends that Forte and Boston Restaurants—Pa. have deprived him of economic benefits he is entitled to as a stockholder. In the

adversary complaint Debtor asserts he was deprived of a "monthly payment" of $2,000. In his brief, Debtor calls this amount a "dividend". Boston Restaurants—Pa. Exhibit 2 is the stockholders' agreement between Debtor and Forte, dated November 1, 1992. It does not entitle him to the $1,350 he claims he was being paid and is due. It entitles him to fifty percent of the profit because he is a fifty percent owner. However, Forte testified that dividends have not been declared. This testimony was not contradicted. Boston Restaurants—Pa. needed its cash because it had experienced tax problems that required it to reduce expenses and make payments on back taxes owed to the IRS. He also testified that Boston Restaurants—Pa. recently had to hire an assistant manager. As explained in note 9, *supra*, Debtor had been receiving $1,350 per month as a loan to enable him to pay his creditors. We note, in addition, that rights attributable to the stock accruing during the prior case belong to that estate. When the chapter 7 is reopened, the chapter 7 trustee can examine the value of the stock and the cause of action Debtor now alleges he possesses.

725 using the fair value method, which examines projected income and divides it by the risk to reach the value. To compute projected income, Dagnon utilized the capitalization of benefits method which is under the broader category of income-based approaches to valuation. Employment of the income-based approach involves determination of "an income figure for the company being valued, determining the appropriate relationship between income and value and then converting the estimated income into an estimate of value." Debtor's Exhibit 15 at 6. Dagnon determined Boston Restaurants—Pa.'s annual earnings potential and the appropriate capitalization rate. He analyzed Boston Restaurants—Pa.'s historical earnings and then adjusted them to achieve a normalized indication of its true earnings history. However, as explained below, Dagnon's adjustments did not account for some important factors peculiar to Boston Restaurants—Pa. which affect the value of Debtor's interest. Although the restaurant opened in the last quarter of 1992, Dagnon used income figures only from 1995 but he considered the fact that sales had increased 11 percent between 1994 and 1995. He used pre-tax income and a pre-tax capitalization rate of 25.16 percent.[22]

In normalizing past earnings, Dagnon adjusted the business's cash flow to reflect normal flows occurring in everyday business transactions. The process eliminates expenses unnecessary to the normal running of the business. The purpose of normalization is to give a picture of the most generic year of operation, based on available data. In his normalization process, Dagnon decreased management fees, unaware that Boston Restaurants—Pa. was going to hire another assistant manager. He increased revenues based on prior years' growth rate, not knowing that, historically, Boston Beanery restaurants' growth leveled off after four years and that Boston Restaurants—Pa. was at this juncture. He did not adjust for existing corporate liabilities or for debts owed to the company. The latter would be included as part of the company's assets. Dagnon decreased rents and concluded that normalized

earnings before taxes would be $83,462. He excluded from the calculation the cost of employees' and managers' meals, characterizing them as unnecessary and valuing them at $1,000. He did not know that Boston Restaurants' policy is to permit each employee to eat within one hour before or after work at a 50 percent discount. Dagnon removed nonrecurring costs such as promotional items and amounts owed to family members in the amount of one thousand dollars. Boston Restaurants—Pa.'s promotional expenses include those for food and drink for management meals, business meetings, employee meal plans, coupons, and other discounts. He did not know the average promotional write-off per month but acknowledged it as a cost of doing business. He testified that every restaurant uses this system. He also testified that Boston Restaurants—Pa. spent $10,441 for advertising in 1995, according to its tax return. He testified that advertising costs would increase in 1996 to enable Boston Restaurants—Pa. to compete.

Dagnon based his calculations on the gross value of rent rather than the specific terms of the lease agreement. He did not know that the lessor owned the liquor license. He did not examine assets and liabilities because he concluded that the business would generate $83,000 in annualized income before taxes. He considered an article he read that said that the outlook for small restaurants is strong but he had not visited the Uniontown Mall restaurant before making his report. He was not aware that one of its anchor tenants, the Hess department store, left the mall. He did not know that Debtor has sued Boston Restaurants—Pa. and Forte or that Debtor's suit said that Dagnon would serve as the liquidating trustee if Debtor was successful, something that he had not agreed to do. Accordingly, his analysis and conclusions were based on the incomplete information he was provided.

Concluding that future earnings would be $83,000 per year, Dagnon used a capitalization rate of 25.16 percent. This rate was reached using the "build up" approach. He began with a risk-free rate of eight percent and added premiums from a textbook/trea-

---

**22.** The higher the capitalization rate, the higher the risk.

tise,[23] Dagnon factored in growth based on Boston Restaurants—Pa.'s 11 percent growth rate in 1994 and 1995. He used this experience although he acknowledged that an 11 percent rate could not be sustained. He also factored in taxes of 25 percent and some risks unique to Boston Restaurants—Pa. and arrived at a capitalization rate of 25.16 percent. *See* Debtor's exhibit 15 at Exhibit E. He concluded that the value of the business is $331,725 before taxes. He compared other restaurants' sales to Boston Restaurants—Pa.'s to check the reasonableness of his capitalization of earnings calculation. He testified that Boston Restaurants—Pa.'s earnings before taxes are higher than in other restaurants. He made no adjustment for the specifics of this situation because he was not given information he deemed essential for that purpose. He did not consult with Boston Restaurants—Pa.'s management because he was instructed not to do so by Debtor's counsel.

Because Debtor would have to sell his shares to realize cash to fund this plan, the question here is the fair market value of the stock. Fair market value is the price to which a willing seller and a willing buyer would agree in an arm's length transaction. Dagnon acknowledged that the fair market value is used for most valuations of the type employed here. Thus, a valuation personal to Debtor based on an assumption that Debtor is involuntarily deprived of the benefit of his stock is not appropriate under the unique circumstances of this case.

Mark M. Gleason testified on behalf of Boston Restaurants. He is a self-employed CPA. He has testified as an expert in valuation issues in federal, state, and bankruptcy courts and has been appointed by the bankruptcy court as an examiner three times. Gleason has experience in the valuation of casual theme restaurants. He concluded that the value of Boston Restau-

rants—Pa. is $20,294 and, therefore, Debtor's 50 percent interest is $10,147. In order to fund his chapter 13 plan, Debtor will have to sell his stock in Boston Restaurants—Pa. Gleason used the fair market value approach which assumes a sale.

Like Dagnon, Gleason normalized expenses. In his normalization calculation, he made adjustments for a new assistant manager, an expense which will continue into the future. This adjustment was based on information received from Forte that another assistant manager was needed to handle the business. Thus, wages, taxes and benefits have to be factored in for this position. Gleason also adjusted for bad debt, advertising and rent. The normalized income arrived at was approximately $35,000. Gleason developed a capitalization rate of 40 percent through a "build up" approach, as did Dagnon. Gleason's capitalization rate was reached by starting with a risk free rate and adding a risk premium, factoring in no growth [24] and a 40 percent tax rate.[25] Gleason also factored in a discount for this stock because there is no market, Debtor's 50 percent ownership is not a controlling interest, and Boston Restaurants—Pa. stock is not publicly traded. In these circumstances, the seller must create a market by discounting the stock's value. Also factored in were Boston Restaurants—Pa.'s excess liabilities which would affect the price that a buyer would be willing to pay.

Gleason reviewed the stock agreement between Debtor and Forte, memoranda and notes, the licensing agreement between Boston Beanery and Boston Restaurants—Pa., and the lease between Boston Restaurants—Pa. and Crown American (the lessor of the mall space). Gleason also used the various textbooks/treatises used by Dagnon.[26] However, in addition to the generalities contained in the books, Gleason examined the specifics

---

**23.** Premiums for market risk and small company risk were based on *Stocks, Bonds, Bills and Inflation 1995 Yearbook*, Ibbotson Associates, 1995. *See* Debtor's Exhibit 15 at Exhibit D.

**24.** The no growth factor was based on information provided by Forte that, historically, Boston Beanery restaurants' growth levels off after four

years and Boston Restaurants—Pa. was reaching that point.

**25.** Debtor contends that Gleason's tax rate is too high for $35,000. Gleason counters that Debtor's is too low for $83,000.

**26.** *See* Debtor's Exhibit 15 at Exhibit D.

of Boston Restaurants—Pa.'s and Debtor's business history and talked to Boston Restaurants—Pa.'s management. As of December 31, 1995, Boston Restaurants—Pa. had negative equity of $57,000. Liabilities included accounts payable to affiliated corporations of $18,000, payroll and sales taxes ($35,000) which exceed current assets, accrued royalties, and accrued dividends ($39,000). Sales were $65,932. Although the books showed $86,037, this amount included payments both for 1994 and 1995.[27] The $1,900 spent in 1995 for advertising is not reflective of higher amounts in prior years or the need for more advertising. Six thousand dollars is consistent with prior years. He did not adjust for an increase in advertising because sales had increased significantly between 1994 and 1995 and he was not familiar with all operations of the business. Furthermore, he testified that he did not have all the detail he would need to correlate advertising with sales and to make necessary adjustments.

Gleason also adjusted for rent. Overage of $3,500 was billed to Boston Restaurants—Pa. for sales ending in November 1995 because that was the first time Boston Restaurants—Pa. made enough money to pay extra rent. Based on the foregoing, Gleason concluded that net operating income was $35,357. He then developed a capitalization rate of 40 percent, pre-tax.[28] Gleason took the earning capacity of the business ($35,357) and divided it by 40 percent to reach the business value of $88,392. Gleason used a capitalization of earnings method but applied assumptions and rates different from those used by Dagnon.

Gleason testified that the value of Debtor's interest is also inhibited by the administrative costs that would be incurred to attract a buyer in light of the absence of a ready market. Marketability of Debtor's 50 per-

cent interest is complicated by the fact that the stock agreement between Forte and Debtor gives Boston Beanery control of the operating decisions for Boston Restaurants—Pa. Because the purchase of a 50 percent noncontrolling, nonmarketable interest has a higher degree of risk than buying a 100 percent interest, Debtor's 50 percent interest is not worth as much as Forte's.

This particular business has inherent risks which must be acknowledged in assessing its worth to a buyer of Debtor's 50 percent interest. For example, (1) there are few or no assets; (2) the stock agreement is restrictive; (3) any prospective buyer has to step into the shoes of the original selling shareholder and the operation remains in the control of Boston Beanery; (4) there is a negative net worth and no cash; and (5) the discount in value Gleason placed on the business in light of its lack of marketability will not disappear, even if 100 percent of the stock is sold. The discount applies even to a controlling shareholder if there is no market. Based on consideration of all the factors, Gleason set the value of the company at $20,294. Therefore, Debtor's 50 percent noncontrolling, nonmarketable interest is, at best, worth $10,147.

We credit Gleason's testimony. Gleason focused on the valuation of Debtor's 50 percent non-controlling interest, considering specific elements of the business and the lack of a ready market. Dagnon focused on the total value of Boston Restaurants—Pa. based on the incomplete information made available to him by Debtor. The focus of Gleason's analysis was the fair market value of the stock, an appropriate reference point in a bankruptcy situation when a sale to a third party is contemplated. Dagnon's focus was not on liquidation but fair compensation as

27. Forte testified that the classification of the $39,000 as dividends was done for tax purposes after the loans to Nesser. Gleason testified that this was an entry on the books. There also were bad debt expenses of $42,000. This amount was adjusted but it is a non-operating expense so it does not affect the valuation numbers.

28. Gleason further testified that the 40 percent capitalization rate is based on a two percent growth rate. The low rate is projected because the anchor tenant left the Uniontown Mall, and

this is a negative indicator for growth in the mall itself. He also set a pre-tax 40 percent capitalization rate based on a 30 to 35 percent federal tax rate and a ten percent state tax rate. Gleason thinks the corporation will increase its taxable income by $35,000 and this would be a 30 percent combined state and federal tax rate. A hypothetical investor looking to buy this business would use the 40 percent pre-tax conversion rate.

between Debtor and Forte on the assumption that Debtor will be involuntarily deprived of the benefit of his interest as though he were a dissenting shareholder. The capitalization rates differ because of the different assessments of risk. Gleason's conclusions were based on factors peculiar to Boston Restaurants—Pa. in conjunction with discussions with management. Dagnon's were based on more generic considerations and the fact that restaurants of this type should sell for a certain amount. Dagnon did not factor in many of the elements that Gleason considered, thus explaining the $48,000 difference between their conclusions of the net operating income of Boston Restaurants—Pa. Dagnon's conclusions were made without consulting management or Debtor. In light of Debtor's non-controlling interest, Gleason included a minority interest discount, although Debtor is not a minority shareholder, and made an adjustment for Boston Restaurants—Pa.'s excess liabilities. Dagnon did not. Based on the foregoing, we conclude that the value of Debtor's interest in Boston Restaurants—Pa. is $10,147.

## SUMMARY OF PLAN CONFIRMATION ISSUES

Since October, 1994, Debtor's only income has been a minimal amount from operation of Lash Sporting Goods. He had to. borrow money to make the initial plan payment, to maintain the liquor license, and to open the bar. His plan relies extensively on the success of Joey's South Street Pub, a lawsuit as to which he may not be the real party in interest due to its status as an asset of the chapter 7 estate, not the chapter 13 estate, and an unrealistic valuation of his interest in Boston Restaurants—Pa.

We find that he has insufficient income to fund a plan. Debtor does not dispute this conclusion but contends that if he is able to sell his stock in Boston Restaurants—Pa. and open a tavern, he will have sufficient income. There is insufficient evidence that the plan would be feasible even if Debtor could sell the stock and open the tavern. The evidence established that the stock is not worth what Debtor says it is and his business projections for the tavern are speculative and inaccurate.

Thus, he cannot meet the goals of chapter 13. *See generally* Baldiga, *Is This Plan Feasible? An Empirical Analysis of Plan Feasibility,* 101 Comm.L.J. 115 (1996).

## BOSTON RESTAURANTS—PA AND MICHAEL J. FORTE'S MOTIONS TO DISMISS ADVERSARY NO. 96–2037

■ The resolution of the motion to dismiss the adversary depends on whether Debtor's cause of action is an asset of the chapter 7 or the chapter 13 estate. The cause of action was not listed in the original or amended chapter 7 schedules. Debtor contends that the cause of action is contingent on his stock ownership and, therefore, was abandoned in the chapter 7 when his interest in the stock was abandoned.

In the motion to dismiss the adversary it is averred, in Count I, that Forte breached a fiduciary duty owed to Debtor. Debtor asserts that after the initial shareholders' meeting of Boston Beanery Forte excluded Debtor from policy decisions, terminated Debtor's dining privileges, and terminated monthly payments that had been made to Debtor. In March, 1994, after the chapter 11 was filed, the monthly payments ceased at Forte's direction. After the chapter 11 was converted to a chapter 7, Forte denied Debtor's request for employment. Debtor also alleges a conspiracy between Forte and the IRS concerning the purchase of Debtor's stock, styling himself as a minority shareholder. Debtor avers self-dealing by Forte. Debtor's cause of action against Boston Restaurants—Pa. is based on Forte's conduct as, in Debtor's view, the controlling shareholder, based on Forte's ownership of Boston Beanery, the franchisor.

We find that Debtor's cause of action against Boston Restaurants—Pa. and Forte is an asset of the chapter 7 estate. For purposes of this opinion, and not by way of a finding of fact on the adversary, we find that the activities complained of began or existed while Debtor was in a chapter 11, as evidenced by the recitations of fact in Debtor's adversary complaint. *See* Adversary No. 96–2037 at ¶ 22 et seq. Debtor conceded that if the events occurred prior to or during the chapter 11, the asset would belong to that

estate but feels that the abandonment of the stock also abandoned the cause of action. Without passing on the merits of this argument as a matter of law, we reject it under the circumstances here. Debtor never disclosed the existence of the cause of action. When questioned specifically at the chapter 7 § 341 meeting, he denied the existence of any cause of action, nor was it revealed in conjunction with the motion to abandon the stock.[29]

■ Although the general equitable power bestowed by § 105 is not to be invoked lightly, we invoke it now. Under our § 105 authority, we will restore the status quo ante, reopen the chapter 7, and vacate the abandonment of the stock to Debtor, without prejudice to Debtor, the chapter 7 trustee, or any chapter 7 creditor raising these issues again in the reopened chapter 7 case. Failure to set aside the abandonment of the stock, which Debtor now claims entitles him to incorporate the cause of action as an asset of the chapter 13 to his benefit and the detriment of his creditors, would reward him for failing to disclose an asset. We also find that, even if the cause of action is contingent on the stock ownership, as Debtor contends, abandonment was based on the chapter 7 trustee's belief that the stock was worth only $500, which figure did not account for the value of the cause of action.[30] Accordingly, the chapter 7 will be reopened and a trustee appointed for examination of the issues surrounding the cause of action and the stock. Debtor's previously claimed chapter 7 exemption of $500 in the stock was, and remains, allowed.

Therefore, the adversary will be dismissed. The chapter 7 bankruptcy estate will be reopened to permit administration or other disposition of the asset (i.e., the cause of action).

29. Debtor testified at trial that he felt that a cause of action existed because of the way he had been treated by Forte and Boston Restaurants—Pa. but that this was after conversion to chapter 7.

30. The chapter 7 trustee testified that he had no knowledge of any cause of action. A transcript of the chapter 7 § 341 meeting held on or about December 6, 1994, establishes that Debtor testified, under oath, that he had no causes of action to declare. Debtor's former counsel, Simon

## MOTION TO REVOKE DISCHARGE

■ We find that Fayette Bank did not prove that Debtor fraudulently obtained his discharge or "knowingly and fraudulently failed to report" acquisition of the cause of action. 11 U.S.C. § 727(d)(1), (2). Although Debtor testified at trial that he "felt" he had a cause of action because of the way he was being treated by Forte and Boston Restaurants—Pa., this idea did not occur to him until after conversion of the chapter 11 case to a case under chapter 7. At trial Debtor further testified that at the time of the chapter 7 § 341 meeting, he did not know that he had a cause of action. We note in this regard that in the chapter 13 case Debtor has a different lawyer and he informed the court that he first articulated the possibility that a cause of action exists. At any rate, the Bank did not prove fraud and, therefore, there is no basis to revoke the chapter 7 discharge. Accordingly, the Bank's motion to revoke the discharge will be denied.

## DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN CREDIT

■ Debtor seeks to borrow $3,000 to open Joey's South Street Pub. The money is necessary to stock the tavern with beverages, do minor refurbishing, and pay other necessary expenses such as security deposits. Debtor's cousin and former counsel in the chapter 7, Simon John, has agreed to lend Debtor the $3,000 but only on the condition that he receive a first lien against Debtor's stock in Boston Restaurants—Pa., inventory and an additional lien against the liquor license that would be subrogated to the lien positions of the Pennsylvania Departments of Revenue and Labor and Industry.[31]

John, who is also his cousin, testified that he knew nothing about any cause of action.

31. This court approved a loan from Simon John to Debtor of $2,000, at six percent interest, secured by a first lien against Debtor's stock in Boston Restaurants—Pa. with the proviso that the loan would be repaid from the proceeds, if any, of the litigation against Forte or the sale of the stock. In the event these things do not occur, the $2,000 loan shall be repaid by payments commencing one month after consumma-

Mr. John testified that he is not willing to lend the money without collateral because of the risk involved in light of Debtor's financial condition and poor management skills, as evidenced by his past history. Debtor avers that he is unable to obtain a loan on any other terms.

The creditors are not united in their positions. The Bank objects to further extension of credit to Debtor. It questions the sense of extending secured credit to Debtor to enable him to make two plan payments and open a business, the prospects of which are poor. Boston Restaurants—Pa. objects on the ground that Debtor's Second Amended Chapter 13 Interim Plan does not provide for distribution to unsecured creditors and additional secured debt will make it even less likely that unsecured creditors will receive any payment.[32] Michael Forte also objects to the motion to obtain credit on the ground that the proposed first lien against Debtor's Boston Restaurants—Pa. stock violates the Stockholders' Agreement which prohibits a stockholder from encumbering or transferring his shares. The United States consents to the motion to incur debt on condition that the relative priority of its liens is unaffected.

The chapter 13 trustee also questions the feasibility of Debtor's proposals. He objects to the motion to incur debt because Debtor has not established that his projections with respect to Joey's South Street Pub are feasible.

Section 364(d)(1)(B) of the Bankruptcy Code provides that the court "may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on" estate property that is already subject to a lien only if adequate protection is provided to the prior lienholder. Debtor has not offered

adequate protection nor has he established that he can provide it in any fashion.

The concept of adequate protection is defined in § 361 of the Bankruptcy Code and can be provided in three different ways. First, adequate protection may be provided by requiring the trustee to make a cash payment or periodic cash payments "to such entity, to the extent that ... any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(1).

Adequate protection may also be provided by,

> providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property.

11 U.S.C. § 361(2). Under § 361(2), should the debtor choose to provide adequate protection by providing creditors with a replacement lien,

> the debtor must prove that the value of the replacement lien is greater or equal to the difference between the value of the [creditor's] liens on debtor's property and the value of the liens after being primed.

*In re Reading Tube Industries*, 72 B.R. 329, 333 (Bankr.E.D.Pa.1987). In *Reading Tube*, projections by the debtor were given some consideration but were not sufficient to meet the burden of proof. *Id.* Economic projections by the trustee as well as by independent consultants may be accepted as sufficient. *See, e.g., In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1089–90 (4th Cir.1986); *In re Reading Tube Industries*, 72 B.R. at 333–34.

The Code also accords courts the flexibility of

---

tion of the chapter 13 plan or dismissal of the chapter 13 case.

After this trial, on February 3, 1997, this court approved a second loan from Mr. John in the amount of $1,250 that Debtor needed to pay renewal fees in order to preserve the liquor license. Mr. John filed an Affidavit on February 18, 1997, stating that he has paid the following amounts pursuant to the February 3, 1997, order: $940.15 to the Pennsylvania Liquor Control Board in renewal application fees; $250 late

filing fee to the PLCB; and $130 to Seaton & Bowman, Inc., for a liquor bond. The total actually borrowed was $1,320.15.

**32.** Boston Restaurants—Pa. also asserts that Debtor does not have regular income. Debtor, however, has regular income. The amount, as discussed above, is insufficient to fund the plan. Boston Restaurants—Pa. also contends that Debtor is not engaged in business. However, Debtor runs Lash Sporting Goods.

granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361(3). Typically, parties utilizing this subsection have the option of demonstrating adequate protection by proving the existence of an equity cushion, a third party guarantee, or substitute collateral. *In Re Reading Tube Industries*, 72 B.R. 329, 333 (Bankr.E.D.Pa.1987).

■ We will deny Debtor's motion for authorization to incur debt. The testimony established that the likelihood of the success of Joey's South Street Pub is speculative. There is no equity in any of Debtor's assets. There is no property upon which to place a substitute lien. Where the substitute collateral is profits from a new business, the court must be sure that an analysis of adequate protection includes an assessment of feasibility and consideration of contingencies. *In re Timber Products, Inc.*, 125 B.R. 433, 440 (Bankr.W.D.Pa.1990). In this case, that analysis leads this court to conclude that the plan is not feasible.

### CONCLUSION

We find that Debtor's plan is not feasible as there is and will be insufficient income to fund it. In making his projections, Debtor did not consider negative factors and is overly optimistic about basic expenses such as insurance and supplies. His projection for funding the plan is speculative in light of all the factors previously discussed.

An appropriate order will be entered.

### ORDER

AND NOW, to-wit, this **7th** day of **March, 1997,** for the reasons stated in the foregoing *Memorandum Opinion*, it is **ORDERED, ADJUDGED AND DECREED** that

(1) With respect to Bankruptcy No. 94–20147 (chapter 7)

(a) Motion No. JPV–2 to Revoke Order of Discharge and Reopen Case is **GRANTED IN PART** and **DENIED IN PART.** It is

**ORDERED** that the Motion to Revoke Order of Discharge is **DENIED.** It is **FURTHER ORDERED** that the Motion to Reopen Case is **GRANTED.**

(2) With respect to Bankruptcy No. 95–23886 (chapter 13)

(a) The Motion to Dismiss Adversary No. 96–2037 is **GRANTED,** without prejudice.

(b) The Objections to Plan Confirmation are **SUSTAINED.**

(c) Motion No. GWS–3 for Authorization to Obtain Credit is **DENIED.**

(d) Motion DHP & W–1 to Dismiss Case is **GRANTED.**

(3) Because the chapter 7 case (Bankruptcy No. 94–20147) is now reopened, the United States Trustee shall appoint a chapter 7 Trustee forthwith. The chapter 7 Trustee shall immediately investigate the alleged cause of action to determine whether to pursue it on behalf of the estate and either shall file an appropriate action or shall report to the court another disposition within 90 days hereof. The Trustee shall act expeditiously to wind up this estate.