**In re Robert E. MAHONEY, Jr., Debtor.**

**No. 98–32417–BKC–SHF.**

United States Bankruptcy Court, S.D. Florida, Palm Beach Division.

March 29, 2000.

---

750

Patricia A. Redmond, Miami, FL, for Robert Mahoney.

Julianne R. Frank, Palm Beach Gardens, FL, for Steven Ungaro.

### *MEMORANDUM DECISION SUSTAINING THE DEBTOR'S OBJECTION TO THE CLAIM OF STEVEN UNGARO*

STEVEN H. FRIEDMAN, Bankruptcy Judge.

This cause came on to be considered at an evidentiary hearing on the *Debtor's Objection To Claim Of Steven Ungaro* ("Objection") filed in this bankruptcy case on October 6, 1998. The evidentiary hearing was held on June 7, 1999.

This Court, having carefully considered the evidence presented by the parties, the demeanor and credibility of the witnesses, the record in this bankruptcy case, and the arguments of counsel, makes the following findings of fact and conclusions of law, pursuant to Bankruptcy Rules 9014 and 7052.

### *FINDINGS OF FACT*

The controversy before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). On May 6, 1998, Mahoney commenced this bankruptcy case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code. On September 17, 1998, Ungaro filed a secured claim in the amount of $1,035,000 ("Disputed Claim").

The Disputed Claim is based upon the final judgment of Justice Isaac S. Garb, dated February 13, 1998 ("Pennsylvania Judgment"), in litigation styled *Quality Systems Associates, Inc. and Robert Mahoney v. Steven Ungaro*, Court of Common Pleas Of Bucks County, Pennsylvania, Number 97–4383. The Pennsylvania Judgment resolved a contract dispute between Mahoney and Ungaro concerning Ungaro's interest in a company known as Quality Systems Associates, Inc. ("QSA"). Mahoney incorporated QSA in October of 1984, as a Pennsylvania corporation. QSA

develops, licenses, and provides maintenance for tape back-up management software products for Tandem computer system. There are 10,000 outstanding shares of QSA, most of which originally were issued by QSA to Mahoney.

Ungaro became an employee of QSA in 1987. In 1995, Mahoney transferred 4500 of his shares in QSA to Ungaro, pursuant to a contractual arrangement with Mahoney and QSA. The 4500 shares represents 45% of the outstanding shares of QSA ("Ungaro 45% Interest"). On May 16, 1997, Ungaro resigned from QSA. Thereafter, Mahoney and QSA commenced the Pennsylvania lawsuit to determine what right Ungaro possessed to retain the Ungaro 45% Interest as a result of his resignation.

Mahoney and Ungaro agreed that the Ungaro 45% Interest was transferred pursuant to a contract and that their dispute was one of contract construction. Pursuant to the February 13, 1998 Opinion, it was determined that Ungaro owned a 45% Interest in QSA. The Pennsylvania Court found that the contract required Ungaro to transfer the Ungaro 45% Interest back to Mahoney as a result of Ungaro's resignation from QSA. In consideration for the transfer, the contract required Mahoney to pay Ungaro the "fair market value" for the Ungaro 45% Interest in QSA.

The Pennsylvania Judgment is the sole basis upon which the Disputed Claim was filed. However, the "fair market value" of the Ungaro 45% Interest has never been determined. Mahoney disputes that the "fair market value" of the Ungaro 45% Interest in QSA is worth the $1,035,000 asserted by Ungaro in the Disputed Claim. As a result, on October 6, 1998, Mahoney filed the Objection.

There are several issues raised by the Objection. Initially the Court must determine the appropriate date for valuation of the Disputed Claim. Both Mahoney and Ungaro agree that the appropriate date to value the Ungaro 45% Interest is either (a) May 16, 1997 (the date of Ungaro's resignation from QSA), or (b) May 6, 1998 (the Petition Date, which is approximately 60 days following the entry of the Pennsylvania Judgment). This Court finds, based upon the plain language of the Pennsylvania Judgment, that the proper valuation date pursuant to the contract between the parties is May 16, 1997, the date upon which Ungaro resigned from QSA.

The second issue is to determine the proper standard for valuing the Ungaro 45% Interest. Mahoney argues that the Pennsylvania Judgment sets the standard of value as "fair market value". Ungaro argues that the proper standard of value is "fair value". This Court finds that in clear and unambiguous terms, the Pennsylvania Judgment directed that the standard of value is "fair market value".

Lastly, the Court must determine the actual valuation of the Ungaro 45% Interest in QSA as of May 16, 1997 ("Valuation Date"). Determining this issue will resolve the allowed amount of Ungaro's Disputed Claim.

### The Expert Opinions Concerning The Value Of The Ungaro 45% Interest

#### 1. Value Conclusions

Two expert business appraisers valued the Ungaro 45% Interest in QSA and testified at the hearing on the Objection.

#### a) The Conclusion Of Arthur Andersen LLP

Arthur Andersen LLP ("Andersen") was engaged to value the Ungaro 45% Interest. On the Valuation Date, Andersen concluded that the value of the Ungaro 45% Interest was equal to $70,000.

In arriving at its conclusion, Andersen first valued an undivided 100% interest in QSA at $280,500. Andersen then took 45% of this figure to reach the proportionate share interest of the Ungaro 45% Interest in QSA. Andersen then ap

plied "valuation discounts[1]" to reflect the fair market value of the Ungaro 45% Interest on the Valuation Date.

### b)   The Conclusion Of Rick Gaskins

Ungaro hired Rick Gaskins ("Gaskins") to value the Ungaro 45% Interest[2]. On the Valuation Date, Gaskins concluded that the value of the Ungaro 45% Interest was $765,000.

In arriving at his conclusion, Gaskins first valued an undivided 100% interest in QSA at $1,700,000. Gaskins then took 45% of this figure to reach the proportionate share interest of the Ungaro 45% Interest in QSA. Because Gaskins applied a "fair value" standard, he apparently deemed it unnecessary to engage in further analysis or discussion as to the basis for his valuation.

### 2.   Valuation Approach and Methodology[3]

Andersen and Gaskins reached different value conclusions because they used different methodologies in connection with valuing an undivided 100% interest in QSA. Andersen ultimately relied upon the income approach to reach its conclusion while Gaskins weighted the results of his income approach (35%) and market approach (65%) in reaching his conclusion.

### a)   The Andersen Approach

Andersen rejected the market approach because the market information that was available was limited from a financial perspective and therefore did not allow for meaningful analysis and comparison to QSA. Andersen therefore used the income approach[4] to value an undivided 100% interest in QSA. Under the income approach, Andersen used the capitalization of earnings method which applies a capitalization rate or a price/earnings multiple[5] to a "normalized" level of earnings derived by averaging the four most recently completed fiscal years prior to the Valuation Date. Andersen deemed this methodology appropriate based upon the cyclical nature of historical revenues and the actual losses experienced by QSA in the two most recent fiscal years, as being reflective of prospective revenues and earnings.

Andersen selected this method under the income approach because: (a) QSA did not prepare budgets or forecasts necessary for the discounted cash flow method; (b) the nature of QSA's business operations and sources of revenue was not expected to change drastically in the future; and (c) QSA's revenue and earnings history served as the best guide, in Andersen's opinion, to project the future prospects of QSA.

Andersen "normalized" the historical earnings of QSA by adding back to reported earnings a salary adjustment for the two senior executives[6], Mahoney and Un-

---

1. These discounts apply when the subject shares do not represent a controlling interest in the entity, and where the entity's stock is not publicly traded. Therefore, hypothetical buyers and sellers are presumed to be the market for the shares, who would discount the stocks value accordingly. In this context, Andersen discounted 15% for lack of control and 35% for lack of marketability of the Ungaro 45% Interest.

2. Gaskins valued QSA as a business enterprise and stated that the Ungaro 45% Interest was equal to his proportionate interest in QSA. This approach is consistent with a "fair value" standard.

3. For reasons not relevant to this opinion, the experts agreed that the cost approach was not applicable in valuing an undivided 100% interest in QSA. Accordingly, the cost approach will not be discussed below.

4. The income approach is utilized in businesses which are going concerns, the value of which is related to its expected stream of earnings or cash flow.

5. The application of the capitalization rate or price/earnings multiple converts earnings to capital sum that equates to equity value.

6. The "normalization" of earnings had the corresponding effect of increasing the value of QSA on the Valuation Date.

garo. Andersen then performed its valuation based upon an average of the four fiscal years immediately preceding the Valuation Date. In performing its analysis, Andersen consulted with current management and key employees of QSA to determine the propriety of potential adjustments to earnings, the future prospects of the business, plans for implementing new product lines in the near future, and the impact on operations as a result of problems leading to Ungaro's resignation.

### b) The Gaskins Approach
#### (i) Income Approach

■ Unlike Andersen, Gaskins employed the discounted economic income method [7] in his income approach. The use and application of the discounted cash flow method adds a level of complexity to the income approach because it relies on forecasts of revenue and cash flow for purposes of arriving at a valuation conclusion. The additional complexities and accompanying uncertainties include determining appropriate levels of additional working capital and capital expenditures required to expand QSA's business, which were not included in Gaskins' projections.

In his income approach, Gaskins "projected" the earnings of QSA for the next ten years. However, the projections were prepared by Gaskins with no input from

QSA's current management or employees. Accordingly, it is impossible to determine whether the assumptions made by Gaskins were reasonable under the circumstances [8]. Further, Gaskins failed to account for a salary for Mahoney who is the President and Chief Executive Officer of GSA. The credulity of the Gaskins' appraisal is substantially undermined by this omission, particularly when one considers that, pursuant to QSA's 1995 and 1996 Federal Income tax Returns, Mahoney earned $269,420 and $234,000 respectively. By eliminating consideration of Mahoney's salary in his appraisal, Gaskins, without explanation or justification, ignores the managerial contributions of Mahoney to QSA's operation. Gaskins' explanation that he need not consider these factors in his projections overlooks the reality that a potential purchaser would be purchasing only a 45% interest in QSA rather than a 100% interest.

#### (ii) Market Approach

In his market approach, Gaskins has upwardly adjusted the gross revenues of QSA as of the Valuation Date by approximately 62% [9]. Gaskins testified that the restated gross revenues reflected amounts that USA earned as royalties/commissions under the distribution agreement described above. However, on cross-examination, Gaskins could not support that this

7. The discounted cash flow method is typically the method of choice when historical earnings and cash flow cannot be used to depict future prospects of a company due to changing conditions impacting a company's financial structure and nature and sources of revenues and resulting profits (i.e., introduction of new blockbuster product), and is also used for businesses which have finite operations (i.e., a mine or quarry).

8. For example, Gaskins made the assumption that QSA would terminate a contract with its distributor, United Software Associates, Inc. ("USA"). However, this contract was in effect on the Valuation Date and was eventually renegotiated to a new contract on July 1, 1998. On the Valuation Date, USA performed QSA's sales and support functions. Gaskins assumed that by terminating the dis-

tribution agreement with USA, QSA would be able to generate higher revenues with lower cost. However, Gaskins did not perform an analysis of the cost USA incurred in performing its duties under the distribution agreement. Further, Gaskins did not interview current management or employees of QSA in obtaining their estimate for the cost of such an undertaking. On cross-examination, Gaskins admitted that factoring in higher expenses would have reduced the value conclusion of an undivided 100% interest in QSA.

9. Pursuant to QSA's Federal Income Tax Return for the year ending September 30, 1997, QSA's gross revenues equalled $536,441. Gaskins has adjusted the gross revenues without justification, to $858,306, and his valuation of QSA is predicated in large part upon this adjusted figure for gross revenues.

was the actual amount that USA earned or that restating the sales under his methodology was proper. Gaskins then multiplied his restated gross sales figure by 2.00 to 2.18, arriving at his conclusion that, under the market approach on the Valuation Date, an undivided 100% interest in QSA would be worth $1,794,000.

Gaskins provided scant explanation as to the basis justifying application of a multiplier to the restated gross sales figure. Gaskins relied solely upon one valuation ratio (the ratio of Price/Revenue) in reaching his value conclusion under the market approach. In limiting his analysis to this one ratio, he ignored the proper application of other financial ratios[10]. Further, on cross-examination, Gaskins admitted that he did not consider: 1) whether the companies selected for comparison were on the same accounting method as set forth in his "restated" gross revenue for QSA; 2) whether the companies selected included possible synergistic value in the transaction; 3) that most of the comparable transactions involved stocks, options, warrants, or earn-out provisions (or some combination thereof) rather than strictly cash; and 4) other factors that authorities on valuing small business interests have determined to be relevant[11]. Accordingly, Gaskins did not make any direct company financial analysis using financial ratios for purposes of determining comparability to QSA. Furthermore, many of the companies which Gaskins relied upon in applying the price-to-revenues ratio, which he used to value GSA, generate annual revenues in excess of $5,000,000. QSA's revenues, for the three years preceding Ungaro's May 16,

1997 resignation, never exceeded $650,000. Thus, the underlying basis for Gaskins' appraisal is seriously flawed.

### The Court's Value Conclusion

After carefully considering all the evidence presented, the Court finds that as of May 16, 1997, the "fair market value" of the Ungaro 45% Interest in QSA was $70,000.

## CONCLUSIONS OF LAW

### A. Jurisdiction

1. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

2. The Court has jurisdiction over the parties and this matter pursuant to 28 U.S.C. §§ 151, 157 and 1334.

### B. Interpretation Of Pennsylvania Judgment

3. Pursuant to the Full Faith and Credit Act set forth in 28 U.S.C. § 1738, this Court must "treat a state court judgment with the same respect that [the judgment] would receive in the courts of the rendering state." *In re Gen. Motors Corp. Products Liab. Litigation*, 134 F.3d 133, 141–42 (3rd Cir.1998).

4. Judgments are to be construed like other written instruments. "Where the language of a judgment is clear and unambiguous, the reviewing court must adopt, and give effect to the plain meaning of the judgment...." *In re 85–02 Queens Blvd. Associates*, 212 B.R. 451, 455 (Bankr.E.D.N.Y.1997) quoting 46 Am.Jur.2d *Judgments* § 93 (1994); accord *Spearman v. J & S Farms, Inc.*, 755

10. Such as price/earnings; price/cash flow; earnings before interest and taxes (EBIT); earnings before depreciation, interest and taxes (EBDIT); etc.

11. According to one treatise, a number of elements of comparison should be considered before selecting a comparative transaction, including but not limited to: the legal rights being transferred, the financing terms, the assets being conveyed, etc. *See*, e.g., Pratt, Reilly & Schweihs, *Valuing Small Businesses*

*And Professional Practices*, 3rd Ed., 1998, Chapter 18 "The Comparative Transaction Method", Chapter 20 "The Gross Revenue Multiples Method", and Chapter 21 "The Comparative Transaction Databases". Further, Pratt, Reilly & Schweihs state that the same types of adjustments should be made to the financial statements of companies involved in the comparative transactions as are made to the financial statements of the subject company. *Id.* at 317.

F.Supp. 137, 140 (D.S.C.1990) (a judgment which is clear and unambiguous must be given its plain meaning and consequent legal effect).

5. This Court may not "'employ [its] own rules ... in determining the effect of state judgments,' but must 'accept the rules chosen by the State from which the judgment is taken.'" *See General Motors,* 134 F.3d at 142 (quoting *Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 373, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996)).

6. The Supreme Court of Pennsylvania has recognized that "[w]here the language [of a writing] is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." *Amoco Oil Company v. Snyder,* 505 Pa. 214, 478 A.2d 795, 798 (1984) (quoting *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 661 (1982)).

7. In this case, the Pennsylvania Judgment resolved a contractual dispute between Mahoney and Ungaro. More specifically, the Pennsylvania Court construed the agreement which gave rise to Mahoney's transfer of the Ungaro 45% Interest in QSA to Ungaro. The plain meaning of the Pennsylvania Judgment requires that Mahoney pay Ungaro the "fair market value" of his shares in QSA.

8. The contract between Ungaro and Mahoney, as described in the Pennsylvania Judgment, also is clear that Ungaro is entitled to be paid the "fair market value" of his shares as of the date of his resignation from QSA, i.e., May 16, 1997.

## C. *The Standard For Valuing The Ungaro 45% Interest*

9. As set forth above, the Pennsylvania Court ordered:

> ... that defendant [Ungaro] shall transfer and deliver to plaintiff, Robert E. Mahoney, Jr., stock certificate no. 9 of plaintiff, Quality Systems Associates, Inc., in the amount of 4,500 shares of

stock upon tender by Mahoney of the fair market value of those shares ...

The Pennsylvania Court did not contemplate for the 4,500 shares to actually be sold. Rather, the Pennsylvania Court first determined whether the contract required Mahoney to pay Ungaro for the return of the Ungaro 45% Interest, and concluded that the contract required Mahoney to pay the "fair market value" for the Ungaro 45% Interest in QSA.

10. The term "fair market value" is a term of art that has been commonly used by courts in the United States as a standard for determining the "price" of property. In arriving at a value for property, the "fair market value" standard attempts to replicate the market place by assuming a hypothetical sale of the property between a willing seller and a willing buyer in an arm's length transaction. See, e.g., *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537–38, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (quoting Black's Law Dictionary 971 (6th ed.1990)); *F & M Schaeffer Brewing Co. v. Lehigh County Bd. of Appeals,* 530 Pa. 451, 610 A.2d 1, 3 (1992); *In re Nesser,* 206 B.R. 357, 366 (Bankr.W.D.Pa.1997).

11. Notwithstanding this authority and the clear directive of the Pennsylvania Judgment, Ungaro argues that the standard to value the Ungaro 45% Interest should be "fair value", rather than "fair market value".

12. There is a distinction between these valuation standards, as applied to the Ungaro 45% Interest, since it represents a non-controlling interest in a privately held company. Under the "fair market value" standard, the hypothetical marketplace requires the application of valuation discounts to the Ungaro 45% Interest in QSA. *See,* e.g., *Nesser,* 206 B.R. at 367. The "fair value" approach ignores the hypothetical marketplace and values the Ungaro 45% Interest based solely upon its proportionate share value in an undivided 100% interest in QSA.

■ 13. The Court rejects Ungaro's position because it ignores the terms of the contract between Ungaro and Mahoney and the clear legal authority that requires this Court follow the plain meaning of the term "fair market value" as used in the Pennsylvania Judgment[12]. Accordingly, the Court will apply the "fair market value" standard in valuing the Ungaro 45% Interest in QSA.

■ 14. Andersen used the "fair market value" standard in its valuation approach and incorporated two valuation discounts to the Ungaro 45% Interest in QSA. First, Andersen applied a valuation discount of 15% for lack of control in QSA. Second, Andersen applied a valuation discount of 35% for lack of marketability. Ungaro did not argue that these discounts were excessive. In fact, almost identical valuation discounts have been approved by bankruptcy courts under similar circumstances. *See, e.g., In re Edwards*, 228 B.R. 552, 568 (Bankr.E.D.Pa.1998); *In re Frezzo*, 217 B.R. 985, 990–91 (Bankr. E.D.Pa.1998) *aff'd in part and appeal dismissed in part*, 225 B.R. 581 (E.D.Pa. 1998).

### D. *Value Of The Ungaro 45% Interest In QSA*

15. The Court finds the testimony and analysis of Andersen to be credible. In performing its valuation, Andersen consulted with management and employees of QSA. Andersen thoroughly explained why it chose the income approach and capitalization of earnings method in valuing the Ungaro 45% Interest.

16. The Court is not persuaded by the testimony of Gaskins. In his report, Gaskins restates the revenues of QSA by increasing them 60% without introducing any evidence to support his upward adjustment of revenues. Further, Gaskins utilized hindsight in his report to cancel out a contract with a distributor when that contract was in place as of the relevant dates to the valuation.

### E. *Value Of The Disputed Claim*

17. The Disputed Claim is based solely upon the value of the Ungaro 45% Interest. Accordingly, the Disputed Claim is hereby allowed in the amount of $70,000. The remainder of the Disputed Claim is disallowed.

For the foregoing reasons, it is hereby

**ORDERED and ADJUDGED** that Ungaro's Claim is allowed in the amount of $70,000.00 ("Ungaro's Allowed Claim"). Upon Mahoney's payment to Ungaro of the entirety of Ungaro's Allowed Claim, Ungaro shall transfer his 4,500 shares of stock in QSA as set forth in the Pennsylvania Judgment. Each party shall bear their own attorneys' fees and costs.

---

**12.** In fact, the Court would employ the "fair market value" standard even assuming that the Pennsylvania Judgment was ambiguous on this point. Mahoney, not QSA, granted the shares pursuant to a contract. The contract, as set forth in the Pennsylvania Judgment uses the terms "market value" which is defined by *BFP*. Further, Ungaro failed to prove that he performed the necessary acts to be accorded dissenter status. *See*, e.g., 15 Pa.C.S.A. § 1572. Ungaro also failed to offer evidence that he is entitled to exercise dissenters' rights. *See*, e.g., 15 P.A.C.S.A. § 1571 et seq.